# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

JEFFREY WIENER, derivatively on behalf of
EATON VANCE MUNICIPALS TRUST,

                Plaintiff,

v.

EATON VANCE DISTRIBUTORS, INC.,
BENJAMIN C. ESTY, ALLEN R. FREEDMAN,
WILLIAM H. PARK, RONALD A.
PEARLMAN, HELEN FRAME PETERS,
HEIDI L. STEIGER, LYNN A. STOUT,
RALPH F. VERNI, and THOMAS FAUST,

                Defendants,

and

EATON VANCE MUNICIPALS TRUST,

                Nominal Defendant.

Civil Action No.: 10-10515-DPW

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Plaintiff, through his attorneys, derivatively on behalf of Eaton Vance Municipals Trust ("the Trust"), makes the following allegations for his Amended Complaint. The allegations are based upon personal knowledge as to plaintiff and his own acts. As to other matters, the allegations are made upon information and belief based on an investigation conducted by plaintiff's attorneys, including a review of the Trust's regulatory filings.

## NATURE OF THE ACTION

2.      This is a shareholder derivative action. It is brought on behalf of the Trust, a Massachusetts business trust registered with the SEC as an investment company (mutual fund). The action seeks to void certain contractual obligations by which Trust assets are being used to pay "asset-based compensation" to broker-dealer firms holding Trust shares in brokerage

accounts.  For 70 years, since the inception of the Investment Advisers Act of 1940 ("Advisers Act"), it has been understood that broker-dealer firms cannot lawfully receive asset-based compensation in connection with brokerage accounts.  To receive any form of compensation other than transactional commissions, a broker-dealer firm must register as an investment adviser pursuant to the Advisers Act, and provide the investor with an "advisory account" -- *i.e.* an account that is subject to the enhanced investor protections of the Advisers Act -- rather than a "brokerage account."

3.     However, beginning in the 1990's, the SEC, using what it believed to be its statutory authority to create public-interest exceptions to the Advisers Act, excluded broker-dealers from the statutory bar against receiving asset-based compensation.  Taking advantage of the more permissive regulatory environment, mutual fund companies, including Eaton Vance, began to use asset-based compensation, rather than transactional commissions, to pay broker-dealers with respect to mutual fund shares held in customer accounts.

4.     Three years ago, in *Financial Planning Association v. SEC,* 482 F.3d 481 (D.C. Cir. 2007), the D.C. Circuit ruled that the SEC had exceeded its authority and vacated the exclusion, reinstating the statutory bar against asset-based compensation in connection with brokerage accounts as of October 1, 2007.  The Trust has nevertheless continued to use Trust assets to pay asset-based compensation to broker-dealer firms in connection with Trust shares held in brokerage accounts.  The Trust's practices violate its duties under the Investment Company Act of 1940 (ICA) (a) to use Trust assets for proper purposes only, (b) to avert securities law violations by service providers to the Trust, and (c) to act as a fiduciary in the interest of shareholders harmed by the unlawful payments.  Plaintiff made a shareholder demand

by letter dated September 17, 2009, asking the Board to take corrective action, which the Board denied by letter dated February 8, 2010.  On March 26, 2010, plaintiff filed this action.

5.     This lawsuit asserts a claim for contract voiding under Section 47(b) of the ICA, which provides that a court may void the unlawful portion of a contract whose performance would cause a violation of any provision of the ICA (or any rule, regulation, or order thereunder) and order restitution.   This federal-question claim is asserted solely against Eaton Vance Distributors, Inc. ("Eaton Vance Distributors"), a broker-dealer with which the Trust has a master Distribution Agreement providing for the payments at issue.  Eaton Vance Distributors disburses the payments to retail broker-dealer firms holding Trust shares in brokerage accounts. Plaintiff also alleges a state-law claim for contract voiding and restitution against Eaton Vance Distributors, raising the same federal questions under the ICA and the Advisers Act.  In addition, on behalf of the Trust, plaintiff asserts state-law claims for injunctive relief and damages against the Trustees, arising from their ongoing failure to perform their duty to reform the payment provision of the Distribution Agreement to comply with statutory law, and their breaches of duty in directly approving the unlawful payments and waste of Trust assets.  This lawsuit is properly being pursued on a derivative basis, and the Trustees' "business judgment" cannot justify ongoing violation of the securities laws, which is *ultra vires* conduct.

### JURISDICTION AND VENUE

6.     This Court has federal question subject matter jurisdiction over all claims asserted herein pursuant to 15 U.S.C. § 80a-43, and 28 U.S.C. § 1331 and § 1337, because each claim involves issues arising under the ICA and the rules and regulations thereunder, and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

7.     This Court has personal jurisdiction over each of the defendants because the Trust's principal place of business is located within this District and all of the defendants have conducted business in this District, including business relating to the claims being asserted herein on behalf of the Trust.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 80a-43 because the Trust maintains its headquarters within this District and because many of the acts complained of herein occurred in this District.

## THE PARTIES

9.     Plaintiff, Jeffrey Wiener, is a resident of Florida.  Plaintiff is invested in Class C shares of the Eaton Vance National Municipal Income Fund, a series of the Trust, and is therefore a shareholder in the Trust.  (Prior to December 1, 2009, the series was named Eaton Vance National Municipals Fund.)  Plaintiff has been a shareholder in the Trust continuously since May 17, 2007.  Plaintiff's shares are held in a brokerage account at Robert W. Baird & Co. Incorporated.

10.     Nominal defendant, the Trust, is a Massachusetts business trust.  The Trust maintains its principal place of business at Two International Place, Boston, MA 02110.  The Trust is classified under the ICA as a series-type open-end management investment company, and issues shares in twenty-five series, or portfolios.  The series are divided into different share classes.  The Trust holds net assets of approximately $9.8 billion.

11.     Defendant Benjamin C. Esty is a current trustee of the Trust.  He has served since 2005, and has been classified by the Trust as an independent board member for purposes of the ICA.

12. Defendant Allen R. Freedman is a current trustee of the Trust. He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

13. Defendant William H. Park is a current trustee of the Trust. He has served since 2003, and has been classified by the Trust as an independent board member for purposes of the ICA.

14. Defendant Ronald A. Pearlman is a current trustee of the Trust. He has served since 2003, and has been classified by the Trust as an independent board member for purposes of the ICA.

15. Defendant Helen Frame Peters is a current trustee of the Trust. She has served since 2008, and has been classified by the Trust as an independent board member for purposes of the ICA.

16. Defendant Heidi L. Steiger is a current trustee of the Trust. She has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

17. Defendant Ralph F. Verni is a current trustee of the Trust. He has served since 2005, and has been classified by the Trust as an independent board member for purposes of the ICA. He has served as Chairman of the Board of Trustees since 2007.

18. Defendant Thomas E. Faust Jr. is a current trustee of the Trust. He has served since 2007, and has been classified by the Trust as an interested board member for purposes of the ICA. The defendants referenced in ¶¶ 11-18 are referred to collectively herein as the "Trustee Defendants."

19.    Defendant Eaton Vance Distributors, Inc. ("Eaton Vance Distributors") is a Massachusetts corporation with its principal place of business at Two International Place, Boston, MA 02110.  Eaton Vance Distributors is a wholly owned subsidiary of Eaton Vance Corporation (NYSE: EV).  Eaton Vance Distributors acts as the principal underwriter/distributor for shares in the Trust.  Eaton Vance Distributors is a broker-dealer member of the Financial Industry Regulatory Authority (FINRA), formerly known as NASD.  Pursuant to the Distribution Agreement with the Trust, Eaton Vance Distributors enters into selling agreements with retail broker-dealers, which act in an agency capacity for Eaton Vance Distributors and the Trust in the distribution of shares of the Trust to members of the public.

## STATUTORY AND REGULATORY BACKGROUND

### Broker-Dealers Are Prohibited From Receiving Asset-Based Compensation With Respect to Brokerage Accounts

20.    The Advisers Act mandates certain disclosure, liability, record-keeping, and conflict-management requirements to protect the clients of professional investment advisers.  An "investment adviser" is defined as "any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]" *See* Section 202(a)(11), 15 U.S.C. § 80b-2(a)(11).

21.    Broker-dealer firms advising retail customers[1] -- which include all of the broker-dealer firms that have selling agreements with Eaton Vance Distributors -- are "engage[d] in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]"  Each firm makes securities recommendations, conducts

---

[1] Broker-dealer firms are regulated by the Securities Exchange Act of 1934 ("Exchange Act"), which defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others" and a "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."  15 U.S.C. §§ 78c(a)(4)(A), (5)(A).  A firm acting as a broker is commonly referred to as a "brokerage firm" or a "broker-dealer" firm.

suitability reviews, and otherwise provides investment advice to its customers (who are also Trust shareholders).[2]

22.     Moreover, each of the broker-dealer firms that has a selling agreement with Eaton Vance Distributors is receiving "compensation."  The term "compensation" is not defined by the Advisers Act, but the SEC has always given it a broad meaning to include any economic benefit in connection with offering a customer account, regardless of the label on the fee, the form of the fee, or the source of the fee.  The "compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing. . . It is not necessary that an adviser's compensation be paid directly by the person receiving investment advisory services, but only that the investment adviser receive compensation from some source for his services." SEC Release No. IA-1092, 1987 SEC LEXIS 3487 (October 8, 1987) at *14-*15.

23.     Accordingly, every broker-dealer firm in the nation that offers full-service brokerage accounts ("execution-only" accounts are not at issue here), including every broker-dealer firm that has a selling agreement with Eaton Vance Distributors, is an "investment adviser" subject to the Advisers Act, unless a statutory exclusion applies.

24.     Every broker-dealer firm that has a selling agreement with Eaton Vance Distributors is required to register as an "investment adviser," thereby becoming a "dual registrant" (*i.e.* registered as both a broker-dealer and an investment adviser), and to provide customers with "advisory accounts" subject to both the Exchange Act and the Advisers Act, rather than brokerage accounts -- unless a statutory exclusion applies.

---

[2]  A broker-dealer may provide an "execution-only" account (such as an Internet-based trading account) that excludes any investment advice, but the Trust is not selling shares through such accounts.

25.     The difference between a "brokerage account" and an "advisory account" is highly significant.  Many broker-dealers avoid becoming dual registrants, or do not provide advisory accounts even if they become dual registrants, because the fiduciary standard of care required under the Advisers Act is higher than the "salesman" standard applicable to brokerage accounts under the Exchange Act and FINRA rules.[3]  Meanwhile, few investors are aware that there are two kinds of accounts with different standards of care and different rules for disclosure of conflicts.

26.     A broker-dealer that serves retail customers but wishes not to comply with the enhanced investor protections of the Advisers Act must qualify for a statutory exclusion from the definition of investment adviser.

27.     One such statutory exclusion, known as the "Broker-Dealer Exclusion," excludes from the definition of investment adviser "any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."  15 U.S.C. § 80b-2(11)(C).

28.     The terms "solely incidental" and "special compensation" as used in the Broker-Dealer Exclusion are not defined in the statute, but the SEC and the courts have given the terms consistent meanings, based on what Congress intended in 1940.

29.     The Broker-Dealer Exclusion "amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular

---

[3] A 204-page SEC-sponsored report, published on January 8, 2008, authored by the RAND Corporation, titled "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers" (available at www.sec.gov/news/press/2008/2008-1.htm ) ("RAND Report"), contains an extensive comparison of the legal duties owed by broker-dealers versus investment advisers. The RAND Report observes that "unlike broker-dealers, federally registered investment advisers owe fiduciary obligations to their clients as a *categorical* matter. . . such obligations require the adviser to act solely with the client's investment goals and interests in mind, free from any direct or indirect conflicts of interest that would tempt the adviser to make recommendations that would also benefit him or her. . . ."  Report at 13 (emphasis in original).

business and that it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business." *Opinion of the General Counsel Relating To Section 202(a)(11)(C) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2 (Oct. 28, 1940), 11 Fed. Reg. 10996 (Sept. 27, 1946).

30.     The term "solely incidental" means "the advisory services rendered to an account are in connection with and reasonably related to the brokerage services provided to that account. This understanding is consistent with the legislative history of the Advisers Act, which indicates Congress' intent to exclude broker-dealers providing advice as part of traditional brokerage services." SEC Release No. IA-2340, 2005 SEC LEXIS 25 (January 6, 2005) at *70.

31.     The term "special compensation" means any form of compensation other than transactional commissions.  *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (Section 202(a)(11)(C) of the Advisers Act applies to broker-dealers "insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions") (emphasis added).

32.     Accordingly, to satisfy both prongs of the Broker-Dealer Exclusion: (a) the broker-dealer firm can provide advice only as part of an undivided package of services, and (b) in connection with that undivided package of services, the broker-dealer can receive compensation only in the form of transactional commissions.

33.     Any broker-dealer that receives asset-based compensation in connection with Trust shares held in a brokerage account *cannot* qualify for the Broker-Dealer Exclusion, because asset-based compensation is not a transactional commission. Asset-based compensation is ongoing payments calculated on the value of assets held in an account, not a transactional payment calculated on the purchase or sale of securities.

34.     Therefore, a broker-dealer receiving asset-based compensation in connection with an account does not qualify for the Broker-Dealer Exclusion with respect to that account.  *See* SEC Release No. IA-2652, 2007 SEC LEXIS 2229 (Sept. 24, 2007) at *7 (proposal to codify a long-standing SEC interpretation that a broker-dealer "is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker-dealer to the Advisers Act.").

**The Rise and Fall of SEC Rule 202(a)(11)-1, Permitting Broker-Dealers to Receive Asset-Based Compensation With Respect to Brokerage Accounts**

35.     Another statutory exclusion from the Advisers Act -- the "SEC Designates Exclusion" -- excludes "such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order" from the definition of investment adviser.  *See* 15 U.S.C. § 80b-2(a)(11)(G).

36.     In the 1990's, the SEC invoked the SEC Designates Exclusion to encourage broker-dealers to shift to asset-based compensation.  With a roaring bull market increasing the value of customers' accounts, many in the broker-dealer industry wanted to receive asset-based compensation in connection with brokerage accounts without having to become dual registrants and offering advisory accounts.  The SEC obliged through a series of "no-action" orders and temporary regulations, culminating with the promulgation of a new regulation -- SEC Rule 202(a)(11)-1, 17 C.F.R. § 275.202(a)(11)-1, which effectively eliminated the second prong of the Broker-Dealer Exclusion, *i.e.*, the bar against "special compensation."  On policy grounds, the SEC took the position that asset-based compensation was merely a re-pricing of the same package of brokerage and advice services that broker-dealers had always provided, while eliminating the incentive to churn accounts for increased transactional commissions, relying in part on an SEC-sponsored study for these conclusions.  *See generally* Report of the Committee

www.sec.gov/news/studies/bkrcomp.txt.[4]

37.     The Final Rule promulgated by the SEC stated that a broker or dealer "will not be deemed to be an investment adviser based solely on its receipt of special compensation" if certain disclosure and other conditions were met, and that a broker or dealer "is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker or dealer to the Advisers Act." *See* 17 C.F.R. § 275.202(a)(11)-1(a)(1) and (c) (the "Rule").

38.     Taking advantage of that trend, mutual fund companies, including Eaton Vance, began offering broker-dealers asset-based compensation in the 1990s.  The mutual fund companies created share classes that reduced or eliminated transactional sales loads in favor of ongoing payments of asset-based compensation.  The mutual fund industry was reacting to the SEC's encouragement to move away from transactional commissions, which in turn was based on the SEC's belief that it had the authority under the SEC Designates Exclusion to authorize broker-dealers holding customer shares in brokerage accounts to receive asset-based compensation, despite the fact that Congress had written the Broker-Dealer Exclusion, which specifically addressed the status and conduct of broker-dealers, not to provide such an exemption.

39.     For instance, in a client newsletter published in 1999, the law firm of WilmerHale (then Wilmer, Cutler & Pickering), told its mutual fund company and broker-dealer clients that, while "[i]nvestment companies have used asset-based fees under rule 12b-1 plans as

---

[4] According to the Tully Report, "[t]he most important role of the [broker-dealer] registered representative is, after all, to provide investment counsel to individual clients, not to generate transaction revenues.  The prevailing commission-based compensation system inevitably leads to conflicts of interest among the parties involved." *Id.* at 3.

compensation for brokerage services, especially for the sale of so-called 'B' and 'C' shares," and although this form of compensation could "involve special compensation," the SEC's "proposed rule 202(a)(11)-1 would provide a clean solution to any questions about the applicability of the term 'special compensation' by providing exemptions from the definitions of 'investment adviser' and 'special compensation' for asset-based compensation[.]"[5]

40.     The Rule required broker-dealer firms, as a condition to their ability to receive "special compensation," to inform their customers, among other disclosures, that their "account is a brokerage account and not an advisory account," and that arrangements with "people who compensate us based on what you buy" may create conflicts of interest.  *See* 17 C.F.R. § 275.202(a)(11)-1(a)(1)(ii).

41.     The Rule was subsequently vacated in its entirety on March 30, 2007 by the Court of Appeals for the D.C. Circuit in *Financial Planning Association,* 482 F.3d at 493.  The court ruled that the SEC lacked the authority to contradict the Broker-Dealer Exclusion and its prohibition on special compensation.  *Id.*  The opinion is also significant because it holds that asset-based compensation is "special compensation" under the Broker-Dealer Exclusion. *Id.* at 488 ("By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.").[6]

---

[5] *See* http://www.mondaq.com/unitedstates/article.asp?articleid=8001 .

[6] The dissenting opinion agreed with the majority's holding that asset-based compensation is "special compensation."  *Financial Planning Association*, 482 F.3d at 494 ("a broker-dealer who receives any kind of compensation other than commissions does not come within the [Broker-Dealer Exclusion], even if he, too, provides advice solely as an incident to his business as a broker-dealer.").  However, unlike the majority, the dissenting judge would have allowed the SEC to proceed under the SEC Designates Exclusion to authorize "special compensation," based on the judge's view that the "other persons" language in the SEC Designates Exclusion is ambiguous, and that the SEC had made a reasonable interpretation of its rulemaking authority to classify broker-dealers that receive "special compensation" as "other persons." *Id.*  Therefore,

42.     At the SEC's request, the court stayed its mandate for six months, until October 1, 2007.  *See* 2007 U.S. App. LEXIS 15169 (D.C. Cir. June 25, 2007).

43.     Accordingly, since March 30, 2007, the law has been re-affirmed that asset-based compensation is "special compensation," and as of October 1, 2007, the statutory bar on "special compensation" in connection with brokerage accounts has been reinstated.  Broker-dealers must instead either (a) receive their compensation solely in the form of transactional commissions or (b) as dual registrants, provide advisory accounts, subject to the Advisers Act, to hold shares, upon which asset-based compensation may be received.

**THE TRUST'S CONTRACTUAL COMMITMENTS AUTHORIZING ASSET-BASED COMPENSATION PAYMENTS WITH RESPECT TO BROKERAGE ACCOUNTS**

44.     On information and belief, the current operative Distribution Agreement between the Trust and Eaton Vance Distributors is dated June 23, 1997.  The agreement provides in paragraph 5(a)(vi) that the Trust "will pay, or cause to be paid (by one or more classes) . . . all payments to be made pursuant to any written plan approved in accordance with Rule 12b-1 under the 1940 Act or any written service plan."  The Trust has a number of Distribution Plans/Rule 12b-1 Plans based on share class.  For instance, the Class C Distribution Plan, dated June 23, 1997, provides for distribution charges and service fees at a total rate equal to 1% per annum of daily net assets.[7]  The Distribution Plan states that Eaton Vance Distributors may "make such other payments to Authorized Firms and other persons as it considers appropriate to encourage

---

the *Financial Planning Association* decision reflects that the SEC, the D.C. Circuit Court of Appeals majority, and the dissenting judge were all in agreement that asset-based compensation is "special compensation" and that broker-dealers are prohibited by the Advisers Act from receiving such compensation, unless (contrary to the decision) SEC Rule 202(a)(11)-1 was a valid exercise of SEC rulemaking authority.

[7] The Trust funds payments of approximately $13 million annually in asset-based compensation to broker-dealers pursuant to the Class C Distribution Plan.

distribution" of shares.  According to the Trust's SEC filings, in addition to financed by Rule 12b-1 Plans, Eaton Vance Distributors makes "marketing support" and/or "administrative services" payments to broker-dealers based on daily net asset values of shares held in customer accounts.  Therefore, payments to a broker-dealer servicing a Trust shareholder will be in excess of a rate of 1% per year of average daily net assets for C shares, with other rates in effect for other share classes, and continue for as long as the shares are owned.

45.      Paragraph 5(d) of the Distribution Agreement provides that the 12b-1 fees will be accrued daily and paid monthly by the Trust.  Eaton Vance Distributors in turn allocates the payments to broker-dealers, broken down to each customer account, calculated to the penny based on daily net asset value of the respective Trust shares held in each customer account. These payments are ongoing, which means that for each customer the payments continue to be made to the customer's broker-dealer for as long as the customer owns Trust shares held in an account serviced by that broker-dealer.

46.      Under the Distribution Agreement, Eaton Vance Distributors may sell shares "to or through financial service firms having agreements with [Eaton Vance Distributors], and to investors[.]" ¶ 2.  Eaton Vance Distributors "covenants and agrees that, in selling the shares of the [Trust], it will use its best efforts in all respects duly to conform with the requirements of all state and federal laws relating to the sale of such shares."  ¶ 4.

47.      SEC Rule 12b-1 under the ICA states that a registered open-end management investment company (*i.e.,* the Trust) "may act as a distributor of securities of which it is the issuer: Provided, That any payments made by such company in connection with such distribution are made pursuant to a written plan describing all material aspects of the proposed financing of

distribution and that all agreements with any person relating to implementation of the plan are in writing[.]."  17 C.F.R. § 270.12b-1.

48.     Accordingly, since the Trust is making payments to broker-dealers financed by Rule 12b-1 Plans, the Trust has elected to "act as a distributor of securities of which it is the issuer." Therefore, Eaton Vance Distributors is acting in an agency capacity on behalf of the Trust, and the retail broker-dealers are acting in a sub-agency capacity, in connection with their distribution activities and the compensation payments they receive.

49.     Nothing in Rule 12b-1 indicates that a mutual fund's financing of distribution-related activities pursuant to the Rule makes it exempt from any other applicable securities laws. For example, advertising financed by Rule 12b-1 Plans is not exempt from the securities laws. The financing of the distribution of prospectuses under Rule 12b-1 does not exempt the prospectuses from other applicable securities laws governing the content and distribution of prospectuses.

50.     The financing of compensation payments to broker-dealers under Rule 12b-1 does not exempt the compensation payments from all other applicable laws governing broker-dealer compensation.  Nothing in Rule 12b-1 precludes broker-dealers from becoming dual registrants or from providing advisory accounts for customers' shares.

51.     There is no conflict between Rule 12b-1 and the Advisers Act.  The Trust, Eaton Vance Distributors, and the sub-agent retail broker-dealers can comply concurrently with Rule 12b-1 and with all other applicable provisions of the ICA and the Advisers Act.

52.     As noted above, the label that appears on compensation is legally irrelevant to whether it constitutes "compensation" for purposes of the broad initial definition of "investment adviser" in the Advisers Act.  Compensation payments financed by Rule 12b-1 Plans constitute

"any economic value" in connection with an account for a package of services that includes investment advice, in the same manner that payments of transactional sales loads, or any other payments, to broker-dealers would qualify as compensation.

53.     Nevertheless, even if the label on the fee were relevant, according to Defendants' trade group, the Investment Company Institute (ICI), "*[t]he primary use of 12b-1 fees is to compensate financial intermediaries for advice and other services to their clients.*" ICI letter to SEC dated July 19, 2007 at 4.  *See* www.sec.gov/comments/4-538/4538-382.pdf .

54.     Similarly, the "*Report of the Working Group on Rule 12b-1,*"[8] prepared for the Board of Governors of the ICI and submitted to the SEC in May 2007, states that "[t]he primary purpose of [12b-1 plan] fees is to compensate financial advisers for advice and other services to their clients." *Id*. at 4.  The report also states that the label "'12b-1 fees' is legalese that does not convey the nature and purpose of these fees.  Identifying 12b-1 fees solely in a manner that describes their purpose without reference to a rule number, could demystify the term for investors.  Specifically, 12b-1 fees should be listed in the prospectus fee table using tailored, straightforward, descriptive terms such as 'third-party investment advice' or 'sales and service charges.'"  *Id*. at 8-9.

55.     Similarly, after a bench trial involving the largest mutual fund family sold through broker-dealers, the court entered a finding of fact that: "12b-1 fees are widely used in the mutual fund industry as a method of compensating broker-dealers for distributing fund shares as well as providing information, advice, and ongoing support services to mutual fund investors." *American Mutual Funds Fee Litig.,* 2009 U.S. Dist. LEXIS 120597 at *32, *56-57 (C.D. Cal. Dec. 28, 2009).

---

[8] *See* www.ici.org/pdf/rpt_07_12b-1.pdf.

### THE TRUST'S PARTICIPATION IN UNLAWFUL CONDUCT

56.     Section 203 of the Advisers Act states that it is unlawful for any investment adviser that has not registered under the Act "to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser." 15 U.S.C. § 80b-3(a).  The receipt of compensation constitutes the use of the means of interstate commerce.

57.     Accordingly, broker-dealer's receipt of asset-based compensation in connection with a brokerage account is unlawful.  The broker-dealer may avoid future violations by becoming a dual registrant and moving the securities into an advisory account; or it may decide to terminate its receipt of asset-based compensation.  Prior to such compliance, its activity is unlawful.

58.     When the Trust and Eaton Vance Distributors make payments of asset-based compensation to broker-dealers, they are participating in the unlawful activity.

### THE DEFENDANTS' DUTIES UNDER THE ICA

59.     The ICA is structured to prevent the Trust and its assets from being used to perpetrate violations of the federal securities laws.

60.     Improper use of Trust assets is regulated through Section 36(a) of the ICA, which provides that mutual fund directors and trustees have a fiduciary duty of care to the Trust -- the highest standard of care known in the law.[9]  The provision creates a federal fiduciary duty for the principal underwriter (Eaton Vance Distributors).  Eaton Vance Distributors already has a fiduciary duty to maximize income for its own shareholder (in this case, Eaton Vance Corp., a

---

[9] Although the provision speaks only of the SEC's authority to file civil actions for breach of fiduciary duty, it implicitly codifies the duty, because the SEC could not enforce a duty that does not exist.  *See Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) ("the Act implicitly established a federal standard of fiduciary duty").

publicly traded company) – but it must also, under the ICA, act in the best interests of the mutual

fund and *its* shareholders, which gives rise to an obvious conflict of interest.  The ICA deals with

this conflict by requiring the unaffiliated board members – the only non-conflicted advocates for

the fund and its shareholders – to actively police[10] service providers' compliance with their

fiduciary duties to the fund and its shareholders.[11]

61.    Using Trust assets to make illegal compensation payments to broker-dealers is an

improper use of Trust assets, in violation of the fiduciary duties imposed on the Trustees and

Eaton Vance Distributors by the ICA.

62.    Using Trust assets to make illegal compensation payments to broker-dealers is

also a violation SEC Rule 38a-1, promulgated under the ICA, which requires Trustees to adopt

compliance programs for the Trust designed to prevent, detect and correct violations of the

securities laws by service providers and their agents.  SEC Rule 38a-1 was adopted following a

series of scandals that rocked the mutual fund industry in 2003, in which service providers to

some mutual funds were discovered to be entering into improper and illegal arrangements that

were abusive to fund investors, due to inadequate or ineffective oversight by fund

directors/trustees.  *See* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980

---

[10] *See Burks v. Lasker*, 441 U.S. 471, 484 (1979) (ICA was "designed to place the unaffiliated directors in the role of 'independent watchdogs'. . . [with] the primary responsibility for looking after the interests of the funds' shareholders"), *quoting Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977).

[11] As explained by the ICI, the mutual fund industry's trade group: "Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the fund's investors.  This unique 'watchdog' role, which does not exist in any other type of company in America, provides investors with the confidence of knowing that directors oversee the advisers who manage and service their investments.  In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company."  *See* Brochure titled "Understanding the Role of Mutual Fund Directors" at 3-4 (1999) available at www.ici.org/pdf/bro_mf_directors.pdf.

(Dec. 17, 2003) at 6 ("Rule 38a-1 Promulgating Release") (stating that "unlawful conduct involving a number of fund advisers, broker-dealers, and other service providers. . . confirms the need for these rules. . . [the service providers] placed the. . . business interests of the fund adviser ahead of the interests of fund shareholders, thus breaching their fiduciary obligations to the funds involved and their shareholders").[12]

63.     Rule 38a-1 requires the board to elect a Chief Compliance Officer ("CCO").  The CCO is required to provide an annual written report to the board that addresses the operation of the compliance policies and procedures of the mutual fund and each of its service providers.  The report must also address any "material compliance matter," which is defined to include a violation of the federal securities laws by the service provider "or agents thereof."  *See* 17 C.F.R. § 270.38a-1(e)(2)(i).  The term "federal securities laws" is specifically defined to include the Advisers Act.  The promulgating release clarifies that "*[s]erious compliance issues must, of course, always be brought to the board's attention promptly, and cannot be delayed until an annual report*."  Rule 38a-1 Promulgating Release at *51 n. 84 (emphasis added).[13]

64.     Moreover, Rule 12b-1 also requires the Trustees to review "at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were

---

[12] *See also* "Special Report: Breach of Trust," BusinessWeek (Dec. 15, 2003) (available at www.businessweek.com ); "The Mutual Fund Scandal: Unfair Fight," Newsweek (Dec. 8, 2003) (www.newsweek.com/id/60819 ); Alan R. Palmiter, "The Mutual Fund Board: A Failed Experiment In Regulatory Outsourcing," 1 Brook. J. Corp. Fin. & Com. L. 165 (Fall 2006); Patrick E. McCabe, "The Economics Of The Mutual Fund Trading Scandal," Board of Governors of the Federal Reserve System staff working paper # 2009-06 (available at www.federalreserve.gov ).

[13] In addition, the CCO is required to meet in executive session with the independent trustees at least once each year, without the presence of anyone else (such as fund management or interested trustees), other than independent counsel to the independent trustees.  *See* Rule 38a-1(a)(4)(iv).  This allows the CCO and independent trustees to speak freely about any sensitive compliance issues of concern to any of them, including any reservations about the cooperativeness or compliance practices of fund management or service providers.

made," thus providing the board with numerous additional opportunities to ascertain that asset-based compensation was improperly being paid in connection with brokerage accounts.

65.     In addition, the customers of the broker-dealers who are being deprived of the advisory accounts that they are entitled by statutory law to receive are the same persons who are the shareholders of the Trust to whom the Trustees and Eaton Vance Distributors owe a fiduciary duty of care.   It is unlawful for defendants to participate in making payments of illegal compensation to broker-dealers holding shares in brokerage accounts maintained by Trust shareholders, thereby depriving the shareholders of the investor protections of the Advisers Act.

**ADDITIONAL DERIVATIVE AND DEMAND REQUIREMENT ALLEGATIONS**

66.     Plaintiff brings this action derivatively in the right and for the benefit of the Trust to redress injuries suffered and being suffered by the Trust as a direct result of the violations of law by Eaton Vance Distributors and the Trustee Defendants.   The Trust is named as a nominal defendant solely in a derivative capacity.

67.     Plaintiff will adequately and fairly represent the interests of the Trust and its shareholders in enforcing and prosecuting their rights.

68.     Plaintiff, in a letter from his attorneys dated September 17, 2009, demanded that the Board of Trustees cause the Trust and its service providers to cease funding and paying asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts in the United States, to restore to the Trust certain of such payments made in the past, and to remedy the Trustees' breaches of their fiduciary duties of loyalty and due care and their waste of Trust assets.   *See* Exhibit 1, attached hereto.[14]

---

[14]  References in the Amended Complaint are to the same exhibits that were filed with the original *Verified Derivative Complaint and Demand for Jury Trial*, dated March 26, 2010.  For the convenience of the Court, the exhibits are attached hereto as well.

69.     By letter dated February 8, 2010, counsel to the Board of Trustees wrote that "the Board has considered these matters thoroughly and has determined, in the exercise of its reasonable business judgment, that the payments identified in the Demand Letter do not result in violations of law and that it would not be in the best interests of the Trust or its shareholders to take the actions identified in the Demand Letter."  *See* Exhibit 2, attached hereto.  The letter concedes that the payments at issue are "asset-based compensation," but reports that the Board of Trustees concluded that asset-based compensation does not constitute "special compensation," for purposes of the Broker-Dealer Exclusion, "in all instances." *Id*. at 5.

70.     The Board's response to the demand is a wrongful refusal to act, for the reasons stated in this complaint.  Continued violation of federal securities laws is not protected business judgment.  In any event, the federal policies underlying the claims asserted herein preempt any state-law rules of internal corporate governance that may be advanced as grounds for terminating this litigation.  Accordingly, the prosecution of these claims on a shareholder derivative basis is appropriate.

## FIRST CAUSE OF ACTION

### Contract Voiding Pursuant to Section 47(b) of the ICA Against Defendant Eaton Vance Distributors

71.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

72.     Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), provides that "either party" to "a contract that is made, or whose performance involves, a violation of [the ICA], or of any rule, regulation, or order thereunder," may request "a court" to void the contract, or partial rescission if the "lawful portion. . . may be severed from the unlawful portion of the contract."

73.    Performance of the Distribution Agreement between the Trust and Eaton Vance Distributors violates (a) the duty of the Trust, the Trustees, and Eaton Vance Distributors not to use Trust assets to make unlawful compensation payments to broker-dealers, (b) the duty of the nonaffiliated Trustees to act as watchdogs over Eaton Vance Distributors and its agents to ensure compliance with the federal securities laws, and (c) the duty of the Trustees and Eaton Vance Distributors to act as fiduciaries for the shareholders deprived of advisory accounts to which they are entitled as a matter of law.  Those duties arise under Section 36(a) of the ICA and Rule 38a-1 thereunder.

74.    The Trust is obligated to void the broker-dealer compensation provisions in its Distribution Agreement between the Trust and Eaton Vance Distributors, because performance cannot be accomplished without violating the foregoing duties under the ICA and SEC Rule 38a-1.

75.    Past unlawful payments to Eaton Vance Distributors and the broker-dealers with selling agreements with Eaton Vance Distributors constitute unjust enrichment to be restituted to the Trust by Eaton Vance Distributors, as follows: for the period July 22, 2005[15] to September 30, 2007, the amount of payments of asset-based compensation to Eaton Vance Distributors and/or the Trust's sub-agents in connection with Trust shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied; and for the period October 1, 2007 to present, the amount of asset-based compensation in connection with Trust shares held in brokerage accounts paid to Eaton Vance Distributors and/or the Trust's sub-agents.

---

[15] The Final Rule's revised disclosure requirements applied to brokerage accounts opened on or after July 22, 2005 for which broker-dealers were relying on the new rule to receive "special compensation."  *See* 70 Fed. Reg. 20424, 20441 (Apr. 19, 2005).

### SECOND CAUSE OF ACTION

**Contract Voiding Pursuant to State Law Against Defendant
Eaton Vance Distributors**

76.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

77.     State common law provides that unlawful agreements may be voided in a declaratory action.   An actual controversy exists over the validity of the broker-dealer compensation payment provisions in the Distribution Agreement between the Trust and Eaton Vance Distributors.

78.     Performance of the Distribution Agreement between the Trust and Eaton Vance Distributors violates and will continue to violate (a) the duty of the Trust, the Trustees, and Eaton Vance Distributors not to use Trust assets to make unlawful compensation payments to broker-dealers, (b) the duty of the nonaffiliated Trustees to act as watchdogs over Eaton Vance Distributors and its agents to ensure compliance with the federal securities laws, and (c) the duty of the Trustees and Eaton Vance Distributors to act as fiduciaries for the shareholders deprived of advisory accounts to which they are entitled as a matter of law.   These duties arise under Section 36(a) of the ICA and Rule 38a-1 thereunder, and the Advisers Act.

79.     The Trust is obligated to void the broker-dealer compensation provisions in its Distribution Agreement between the Trust and Eaton Vance Distributors, because performance cannot be accomplished without violating the foregoing duties under the ICA and SEC Rule 38a-1 and the Advisers Act.

80.     Past unlawful payments to Eaton Vance Distributors and the broker-dealers with selling agreements with Eaton Vance Distributors constitute unjust enrichment to be restituted to the Trust by Eaton Vance Distributors, as follows: for the period July 22, 2005 to September 30,

**THIRD CAUSE OF ACTION**

**Breach of Contract Against Defendant Eaton Vance Distributors**

81.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

82.     The Trust has elected to act as distributor of its own shares, and has entered into the Distribution Agreement with Eaton Vance Distributors, which has distribution agreements with the Trust's sub-agents, the retail broker-dealers, for servicing shareholders, and for payment of compensation from Trust assets to Eaton Vance Distributors and the sub-agent retail broker-dealers.  In the Distribution Agreement, Eaton Vance Distributors, on behalf of itself and its sub-agent broker-dealers, warrants that it will comply with the federal securities laws.

83.     In material breach of its contractual promise, Eaton Vance Distributors receives asset-based compensation from the Trust in connection with Trust shares held in brokerage accounts at its sub-agent retail broker-dealers in violation of the Advisers Act.  In further breach of its contractual promise to abide by the federal securities laws, Eaton Vance Distributors makes payments of asset-based compensation to the sub-agent retail broker-dealers who maintain brokerage accounts holding Trust shares in violation of the Advisers Act.

84.     To be in compliance with the Advisers Act, Eaton Vance Distributors must ensure that the sub-agent retail broker-dealers either (a) hold Trust shares in advisory accounts, not

brokerage accounts (which would allow them to lawfully receive asset-based compensation), or (b) receive transactional commissions only.

85.     As a result of Eaton Vance Distributors' breaches, there has been a *per se* waste of Trust assets for illegal payments, causing harm to the Trust and its shareholders.  In addition, Eaton Vance Distributors' breaches of contract caused Trust shareholders to be deprived of advisory accounts subject to the investor protections and benefits of the Advisers Act.

86.     The Trust's damages equal, for the period July 22, 2005 to September 30, 2007, the amount of payments of asset-based compensation to Eaton Vance Distributors and/or the Trust's sub-agents in connection with Trust shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied, and for the period October 1, 2007 to present, the amount of asset-based compensation in connection with Trust shares held in brokerage accounts paid during the period to Eaton Vance Distributors and/or the Trust's sub-agents.

## FOUTH CAUSE OF ACTION

### Breach of Fiduciary Duty Against the Trustee Defendants

87.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

88.     The Trustee Defendants are fiduciaries of the Trust and of all of its shareholders and owe them the duty to conduct the affairs of the Trust loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based upon the Trustee Defendants' acts in violation of state law, which acts constitute breaches of fiduciary duty.

89.     Each of the Trustee Defendants participated in the acts of misconduct and mismanagement alleged herein, or acted in reckless disregard of the facts and law known to them, and failed to exercise due care to prevent the misuse of Trust assets.  The Trustee

Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein, including the deficiencies in the compliance policies and procedures of the Trust and its service providers permitting unlawful payments of asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts.  The Trustee Defendants thereby breached their duty of care and loyalty to the shareholders of the Trust by failing to act as ordinary prudent persons would have acted in a like position.

90.      Each of the Trustee Defendants also engaged in dereliction of duty and demonstrated a conscious disregard for his or her responsibilities.  The Board of Trustees had an affirmative duty to investigate the legality of the broker-dealer compensation payments, including through mandated quarterly reviews of 12b-1 fee payments, annual compliance reviews of service providers, and responding to "material compliance matters" as defined by SEC Rule 38a-1, including determining whether Trust shares were held in brokerage accounts. The Trustee Defendants thereby acted in bad faith to the shareholders of the Trust by failing to act as ordinary prudent persons would have acted in a like position.

91.      As a result of the foregoing, the Trust has suffered considerable damage to and material diminution in the value of its assets because of the illegal compensation paid to Eaton Vance Distributors and the Trust's sub-agents.

92.      Each of the Trustee Defendants, singly and in concert, engaged in the aforesaid conduct in reckless disregard and/or intentional breach of his or her fiduciary duties to the Trust.

93.      Plaintiff, on behalf of the Trust, seeks declaratory and injunctive relief and damages and other relief from the Trustee Defendants.

## FIFTH CAUSE OF ACTION

### Waste of Trust Assets Against the Trustee Defendants

94.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

95.     As a result of their authorizing payment of unlawful asset-based compensation from Trust assets to Eaton Vance Distributors and the Trust's sub-agents, and by failing to properly consider the interests of the Trust and its shareholders through proper supervision, the Trustee Defendants have caused a *per se* waste of valuable Trust assets.

96.     As a result of the waste of Trust assets, the Trustee Defendants are liable to the Trust.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment on behalf of the Trust as follows:

(a)     Determining that this action is a proper derivative action maintainable under law, that the demand requirement was satisfied, and that demand was wrongfully refused;

(b)     Against each Defendant for restitution and/or damages in favor of the Trust;

(c)     Declaratory and injunctive relief as permitted by law, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the asset-based compensation previously paid to Eaton Vance Distributors and enjoining the Trust and Eaton Vance Distributors from any further payments of asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts in the United States;

(d)     Awarding pre-judgment interest on all monetary damages;

(e)     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(f)     Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**BERMAN DEVALERIO**

DATED:  June 28, 2010

/s/ Glen DeValerio
Glen DeValerio
gdevalerio@bermandevalerio.com
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

Michael C. Spencer
mspencer@milberg.com
Janine L. Pollack
jpollack@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:   (212) 868-1229

Lee A. Weiss
lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY  10018
Telephone:  (212) 354-4901
Facsimile:   (212) 354-4904

Ronald A. Uitz
ron877@yahoo.com
**UITZ & ASSOCIATES**
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:   (202) 521-0619

Richard J. Lantinberg, Esq.
RLantinberg@whmlegal.com
**WILNER HARTLEY & METCALF, P.A.**
444 E. Duval Street
Jacksonville, FL  32202
Telephone: (904) 446-9817
Facsimile: (904) 446-9825

***Attorneys for Plaintiff***

28

06/25/2010  11:33    9049969559                    JWIENER                                    PAGE   01/01

## VERIFICATION

I, Jeffrey Wiener, under penalties of perjury, state that I have read the foregoing

Amended Verified Derivative Complaint and authorize its filing, and that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated: June___, 2010

_____
Jeffrey Wiener

## <u>CERTIFICATE OF SERVICE</u>

I certify that the Amended Complaint and Demand for Jury Trial in Civil Action No. 10-10515-DPW, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 28, 2010.

<u>/s/ Glen DeValerio</u>
Glen DeValerio