## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JEFFREY WIENER, derivatively on behalf of
EATON VANCE MUNICIPALS TRUST,

        Plaintiff,

v.

EATON VANCE DISTRIBUTORS, INC.,
BENJAMIN C. ESTY, ALLEN R. FREEDMAN,
WILLIAM H. PARK, RONALD A.
PEARLMAN, HELEN FRAME PETERS,
HEIDI L. STEIGER, LYNN A. STOUT,
RALPH F. VERNI, and THOMAS FAUST,

        Defendants,

and

EATON VANCE MUNICIPALS TRUST,

        Nominal Defendant.

Civil Action No. 10-10515-DPW

## PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS
## THE AMENDED COMPLAINT BY DEFENDANTS
## EATON VANCE DISTRIBUTORS, INC. AND THOMAS E. FAUST JR.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTS ALLEGED IN THIS CASE .........................................................................................4

      A.     Historical Context.....................................................................................5

      B.     The Rise and Fall of SEC Rule 202(a)(11)-1, Allowing Broker-Dealers to Receive Asset-Based Compensation .......................................................5

      C.     The Payments at Issue ..............................................................................7

      D.     Recent Development:  The SEC Proposes  to Rescind Rule 12b-1.............8

LEGAL STANDARD ...............................................................................................................8

ARGUMENT.............................................................................................................................9

    I.     THE PAYMENTS AT ISSUE ARE UNLAWFUL ..............................................9

      A.     All Broker-Dealers Fall Within the Broad Definition of Investment Adviser.....................................................................................................9

      B.     The Broker-Dealer Exclusion Is Inapplicable If Asset-Based Compensation Is Received .......................................................................10

    II.    UNLAWFUL PAYMENTS ARE AN IMPROPER USE OF TRUST ASSETS.............................................................................................................14

    III.   DEFENDANTS' DUTIES UNDER THE ICA TRUMP THEIR CONTRACTUAL ARRANGEMENTS TO MAKE UNLAWFUL PAYMENTS..........................................................................................................16

      A.     Section 47(b) Permits Actions for Rescission and Restitution.................16

      B.     The State Law Contract-Voiding Count Is Not Preempted......................19

    IV.   THE COURT SHOULD EXERCISE EITHER FEDERAL QUESTION OR SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS .............................................................................................................20

CONCLUSION..........................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)....................................................................................................9

*Berckeley Inv. Group Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) .........................................................................................17

*In re: Charles Schwab Corp. Securities Litigation*,
257 F.R.D. 534 (N.D. Cal. 2009)..................................................................................19

*Couldock & Bohan, Inc. v. Societe Generale Securities Corp.*,
93 F. Supp. 2d 220 (D. Conn. 2000).............................................................................17

*Everett v. Bozic*,
No. 05-296, 2006 U.S. Dist. LEXIS 55824 (S.D.N.Y. Aug. 2, 2006)...........................18

*Financial Planning Ass'n v. SEC*,
482 F.3d 481 (D.C. Cir. 2007) ..........................................................................1, 6, 14

*Fogel v. Chestnutt*,
533 F.2d 731 (2d Cir. 1975) .........................................................................................15

*Franklin Nat'l Bank v. L.B. Meadows & Co.*,
318 F. Supp. 1339 (E.D.N.Y. 1970) .............................................................................17

*Freeman v. Marine Midland Bank-New York*,
No. 71-42, 1979 U.S. Dist. LEXIS 12177 (E.D.N.Y. May 24, 1979)...........................17

*Frishman v. Maginn*,
912 N.E.2d 468 (Mass. App. 2009) ..............................................................................19

*Gargano v. Liberty Int'l Underwriters, Inc.*,
572 F.3d 45 (1st Cir. 2009).............................................................................................9

*GFL Advantage Fund, Ltd v. Colkitt*,
272 F.3d 189 (3d Cir. 2001) .........................................................................................17

*Green v. Fund Asset Management, L.P.*,
245 F.3d 214 (3d Cir. 2001) .........................................................................................19

*Hayes v. Ellrich*,
No. 06-3815, 2009 Mass. Super. LEXIS 188 (Sup. Ct. Suffolk July 13, 2009)...........19

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982)........................................................................................................19

*Kassover v. UBS AG*,
   619 F. Supp. 2d 28 (S.D.N.Y. 2008) ...................................................................13

*Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   464 F. Supp. 528 (D. Md. 1978) .......................................................................13

*Kelly v. Kosuga*,
   358 U.S. 516 (1959) ...........................................................................................19

*Luzerne County Retirement Board v. Makowski*,
   627 F. Supp. 2d 506 (M.D. Pa. 2007) ...............................................................13

*Margaret Hall Foundation, Inc. v. Atl. Fin. Mgmt., Inc.*,
   572 F. Supp. 1475 (D. Mass. 1983) ..................................................................17

*Olmsted v. Pruco Life Ins. Co.*,
   283 F.3d 429 (2d Cir. 2002) .............................................................................17

*Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc.*,
   988 F.2d 288 (1st Cir. 1993)..............................................................................19

*Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) ............................................................................18

*Rhoades v. Powell*,
   644 F. Supp. 645 (E.D. Cal. 1986) ...................................................................17

*Rhode Island Fishermen's Alliance, Inc. v. Rhode Island Dept. of Environmental Management*,
   585 F.3d 42 (1st Cir. 2009).................................................................................20

*Roberts v. Smith Barney Harris Upham & Co.*,
   653 F. Supp. 406 (D. Mass. 1986) ....................................................................17

*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006) ...............................................................15

*Smith v. Franklin/Templeton Distributors*,
   No. 09-4775, 2010 U.S. Dist. LEXIS 56516 (N.D. Cal. June 8, 2010).....................3

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005).................................................................18

*Thomas v. Metropolitan Life Ins. Co.*,
   No. 07-121, 2009 U.S. Dist. LEXIS 78014 (W.D. Okla. Aug. 31, 2009) ...............13

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979)......................................................................................16, 17

*United States v. First City Nat'l Bank*,
   386 U.S. 361 (1967)...........................................................................................10

*Yameen v. Eaton Vance Distributors, Inc.*,
  394 F. Supp. 2d 350 (D. Mass. 2005) ..................................................12

**STATUTES**

15 U.S.C. § 78cc(b) ...............................................................................17

15 U.S.C. § 80a-2(a)(35) ........................................................................12

15 U.S.C. § 80a-46(b) ............................................................................16

15 U.S.C. § 80b-2(11) ..........................................................................9, 10

15 U.S.C. § 80b-15 ................................................................................16

15 U.S.C. § 80b-1 ...................................................................................1

15 U.S.C. § 80a-1 ...................................................................................1

17 C.F.R. § 270.6c-10(a)(i) ......................................................................8

17 C.F.R. § 270.12b-1(a)(2) ....................................................................7

17 C.F.R. § 270.38a-1 ............................................................................15

17 C.F.R. § 275.202(a)(11)-1 ...................................................................6

**OTHER AUTHORITIES**

2005 Final Rule Release
  70 Fed. Reg. 20424 (April 19, 2005) ..............................................10, 11

Arthur B. Laby, *Reforming the Regulation of Broker-Dealers and Investment Advisers*
  65 Bus. Law. 395 (Feb. 2010) .........................................................14

Final Rule, Promulgating Release No. IC-26299,
  2003 SEC LEXIS 2980 (Dec. 17, 2003)................................................15

*In re O'Brien Partners, Inc.*, Sec. Act Release No. 7594, IA-1772,
  1998 SEC LEXIS 2318 (Oct. 27, 1998) ...............................................10

*In re: Quest Capital Strategies, Inc.*,
  1999 SEC LEXIS 727 (Apr. 12, 1999)...................................................12

S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940).................................11

SEC Rel. Nos. 34-42099, IA-1845,
  1999 SEC LEXIS 2356 (Nov. 4, 1999) ...................................................6

SEC Rel. No. IA-1092,
  1987 SEC LEXIS 3487 (October 8, 1987) ..............................................10

SEC Rel. No. IA-2340,
    2005 SEC LEXIS 25 (Jan. 6, 2005)..........................................................................................11

SEC Rel. No. IA-2652,
    2007 SEC LEXIS 2229 (Sept. 24, 2007)................................................................................11

SEC Rel. No. IC-1643
    53 Fed. Reg. 23258 (June 21, 1988)......................................................................................12

SEC Rel. No. IC-26372,
    2004 SEC LEXIS 474 (Feb. 27, 2004)..................................................................................13

Plaintiff Jeffrey Wiener, suing derivatively on behalf of Eaton Vance Municipals Trust ("Trust"), respectfully submits this opposition to the motion to dismiss the Amended Complaint filed by defendants Eaton Vance Distributors, Inc. and Thomas E. Faust Jr. ("Motion").  Plaintiff incorporates by reference the arguments made in his opposition brief to the motion to dismiss filed by the Independent Trustee Defendants and the nominal defendant.

## PRELIMINARY STATEMENT

This is a derivative action on behalf of the Trust, a Massachusetts business trust registered with the SEC as a series-type open-end management investment company (mutual fund) under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq*.  The action seeks to void certain contractual obligations by which Trust assets are being used to pay asset-based compensation to broker-dealer firms holding Trust shares in brokerage accounts.

Defendants apparently acknowledge that if a broker-dealer firm arranges to deduct and receive compensation from a customer in the form of an ongoing fee at the rate of 1% per year of the value of the assets held in the customer's brokerage account, that receipt of asset-based compensation would be a violation of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-1 *et seq*., and the compensation payments would be *unlawful*.  Motion at 9 (citing *Financial Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007).  However, if the same broker-dealer firm arranges to receive the same compensation, but the amounts are Rule 12b-1 fees being deducted by the mutual fund, then that asset-based compensation arrangement is lawful, according to defendants.

Defendants do not contest that, in both arrangements, the broker-dealer is performing identical services (a package of brokerage services and investment advice) for the customer account.  Nor do defendants contest that the compensation payments are identical (ongoing payments, for the entire duration of the customer's investment, accrued at a set percentage of the value of assets held in the account).  Although the two arrangements involve different service firms processing the payments,

defendants do not contest that the result is identical: the investor pays at the rate of 1% per year and the broker-dealer receives that money.

According to defendants, the only types of fees governed by the Advisers Act are fees "for investment advice," Motion at 7, and Rule 12b-1 payments are "expressly for sales transactions and shareholder account services." Motion at 7-8. Defendants assert that Rule 12b-1 payments are "functionally 'transactional commissions'" of the type allowed in connection with brokerage accounts. Motion at 8-9. In sum, defendants state: "Nothing in the federal securities laws states that an investor cannot elect to spread a commission payment over a number of years … rather than paying the whole, potentially higher commission, up front." Motion at 9.

Defendants' argument misstates key facts and fundamentally misconstrues the Advisers Act. As alleged in the Amended Complaint, the fees at issue here are of unlimited duration, with no connection to a transactional sales load, and are passed directly to the broker-dealers. *See* Amended Complaint (AC) ¶ 45. Defendants are also factually wrong in asserting that Rule 12b-1 payments to brokers-dealers are not "for investment advice." Motion at 7. As explained in the Amended Complaint, any economic benefit is considered to be compensation for investment advice under the Advisers Act if it is received in connection with an account to which investment advice is provided, but even if the label, or purpose, or subjective intent of the payment were relevant, the fact is: "**The primary use of 12b-1 fees is to compensate financial intermediaries for advice and other services to their clients.**" AC ¶ 53 (quoting a letter from the mutual fund industry's leading trade group, the Investment Company Institute, to the SEC, dated July 19, 2007, at 4).

Similarly, the trade group for independent directors/trustees of mutual funds, the Independent Directors Council (IDC), has given the SEC the results of a study that: "**Today, the overwhelmingly predominant use (98%) of 12b-1 fees is for professional advice (initial and ongoing) and shareholder servicing. Only a small fraction (2%) of 12b-1 fees are used by funds for promotion,**

**advertising and other miscellaneous expenses.**"[1] The IDC proposed in a comment letter to the SEC that Rule 12b-1 fees be given a proper label with "descriptive terminology" -- *i.e.*, calling it, in their words, a "**third-party advice**" fee. *Id*. at 6; *see also* AC ¶ 54 (ICI Report of the Working Group on Rule 12b-1, dated May 2007, recommended to the SEC that "**12b-1 fees should be listed in the prospectus fee table using tailored, straightforward, descriptive terms such as `third-party investment advice'**[.]").[2]

Defendants bolster their factual assertion with the decision in *Smith v. Franklin/Templeton Distributors*, No. 09-4775, 2010 U.S. Dist. LEXIS 56516 at *21 (N.D. Cal. June 8, 2010), which itself rested on the court's assertion that Rule 12b-1 fees are not used "for services to customers."  Motion at 9.  The *Franklin/Templeton* court adopted that factual assertion on a motion to dismiss, without any factual record, and used it to conclude erroneously that the Advisers Act does not apply to asset-based compensation payments.  The *Franklin/Templeton* court invited amendment of the complaint and will be able to revisit the matter – which hopefully will include consideration, if that court is still resolving disputed facts at the pleadings stage, of the contrary evidence:  Franklin Templeton's own web site prominently states that mutual funds with Rule 12b-1 fees are designed for investors that "**prefer to 'pay as they go' for professional investment advice.**"[3]).

In any event, the applicability of the Advisers Act is not based on ascertaining the subjective intent of parties to compensate for investment advice.  Virtually all professionals who give investment advice do so as part of a package of services (portfolio manager, brokerage, custodial and/or

---

[1] *See* IDC letter to SEC dated July 19, 2007, at 2 n. 3 (citing an ICI study).  *See* www.sec.gov/comments/4-538/4538-277.pdf.

[2] Defense counsel for the Trustees here, Goodwin Procter LLP, has also said that 12b-1 fees compensate for investment advice.  In a newspaper interview just a few days after the firm submitted its brief in this case arguing the opposite, a Goodwin Procter partner was quoted as saying that broker-dealers "give advice on asset-allocation and performance," and if Rule 12b-1 were to be rescinded by the SEC, "[l]imiting the amounts of money available to compensate those advisers could have the unintended consequence of limiting the advice available to investors."  *See* Declaration of Janine Pollack (Pollack Decl.), Ex. 1, submitted herewith.

[3] *See* www.franklintempleton.com/retail/pages/generic_content/education/fund_basic/about/ share_cl_options.jsf.

recordkeeping services, etc.) and their compensation arrangements (commissions, management fees, etc.) rarely label their fees as specifically for investment advice.  Under a proper, step-by-step statutory analysis, the Advisers Act applies based on objective factors, *i.e*., in this case, the receipt of ongoing asset-based compensation in connection with a customer account to which investment advice is included in the package of services provided to that account.

Defendants' remaining arguments are also without merit.  Nothing in SEC Rule 12b-1 either can or does override the concurrently applicable requirements of the Securities Exchange Act (Exchange Act) and the Advisers Act.  The core purpose of the Investment Company Act (ICA) is to prevent Trust assets from being used improperly, and the ICA's contract-voiding provision, § 47(b), ensures as a matter of federal law that a regulated party's duties under the ICA will prevail over any contrary contractual obligations.  Definitive U.S. Supreme Court authority squarely rejects defendants' specious argument that the violations underlying the contract-voiding request must themselves be subject to private rights of action.  In sum, the Amended Complaint adequately alleges claims for contract-voiding under § 47(b), contract-voiding under state law, and breach of contract, and the motion to dismiss should be denied.

## FACTS ALLEGED IN THIS CASE

For 70 years, the Advisers Act has been consistently interpreted and applied to ensure that customers who pay for an ongoing relationship receive the Advisers Act benefits of non-conflicted advice, full disclosure by the adviser of any third-party compensation arrangements, and protections by virtue of fiduciary-level duties imposed on the adviser -- far different from the mere transactional "salesman" duties of commission-based brokers.  AC ¶ 25.  The Advisers Act supplements Exchange Act regulation of certain customer accounts at broker-dealers, including accounts in which there is receipt of any form of compensation other than transactional commissions.  AC ¶¶ 20-34.

A.      **Historical Context**

Beginning in the 1990s, mutual fund companies, including Eaton Vance, created share classes that reduced or eliminated transactional sales loads in favor of ongoing payments of asset-based compensation directly to broker-dealers.  AC ¶ 38.  Prior to the 1990s, many mutual fund companies were using a different arrangement, whereby Rule 12b-1 fees of limited duration were used by the mutual fund company to recoup the advance of a sales commission to the broker-dealer at the time of the sale.  Eaton Vance began that practice in 1985.[4]  However, beginning in 1993, Eaton Vance began a new arrangement of paying asset-based compensation directly to the broker-dealers.  In the Eaton Vance Form 10-K filed at the time, that new share class was referred to as "level-load shares" and the 10-K stated that "**[t]he introduction of level-load shares is consistent with the efforts of many broker/dealers to rely less on transaction fees and more on continuing fees for servicing assets**."[5]

In the 1990s, broker-dealers wanted to encourage asset-based compensation arrangements in which their compensation would grow over time with the bull market, yet also wanted to avoid complying with the Advisers Act.  AC ¶ 36.  Encouraged by the SEC (which thought this was good policy to discourage churning), asset-based compensation arrangements became commonplace, notwithstanding that the Advisers Act does not allow broker-dealers to receive asset-based compensation without registering under the Advisers Act and holding the customer's assets in an account subject to the Advisers Act.  AC ¶¶ 20-34.

B.      **The Rise and Fall of SEC Rule 202(a)(11)-1, Allowing Broker-Dealers to Receive Asset-Based Compensation**

Expressly acknowledging the statutory ban on asset-based compensation, the SEC issued a proposed regulation and a no-action position that had the effect of suspending the statutory ban and allowing broker-dealers to receive any form of compensation in connection with customer accounts

---

[4] *See* Pollack Decl., Ex. 2 (excerpt from Form 10-K filed by Eaton Vance Corp., parent to defendant Eaton Vance Distributors, for fiscal year ending 10/31/1994 filed 1/18/1995).

[5] *Id.*

without triggering the requirements of the Advisers Act.  AC ¶ 36.[6]  This action occurred in 1999, but the industry interpreted the no-action position to be retroactive, as the SEC also acknowledged that asset-based compensation arrangements had already flourished.  *Id.*  The SEC's new regulation relied on the SEC's statutory authority in the Advisers Act to designate by order or regulation other persons not within the "intent" of the Advisers Act's coverage to be excluded from the Advisers Act.  AC ¶ 35.

The mutual fund industry cheered this development.  For instance, a client bulletin issued at the time by WilmerHale (then known as Wilmer, Cutler & Pickering) explained that the new regulation provided "a clean solution" to finding a firm legal basis for the asset-based broker-dealer compensation arrangements introduced by the mutual fund industry under Rule 12b-1 in the 1990s.  AC ¶ 39.[7]

A final rule was promulgated in 2005, *see* SEC Rule 202(a)(11)-1, 17 C.F.R. § 275.202(a)(11)-1, and was immediately challenged in the Court of Appeals for the D.C. Circuit by a trade group of registered investment advisers.  AC ¶¶ 37, 40-41. On March 30, 2007, the D.C. Circuit vacated the SEC regulation in its entirety, ruling that the SEC lacked the authority to contradict the Advisers Act which, according to the court's analysis, prohibits broker-dealers from receiving any form of compensation other than transactional commissions.  *See Financial Planning Ass'n,* 482 F.3d at 488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.**").  AC ¶ 41.  At the SEC's request, the court stayed its mandate for six months, until October 1, 2007.  AC ¶ 42.  The decision in *Financial Planning Ass'n* essentially reinstated the statutory ban on asset-based compensation.  AC ¶ 43.

---

[6] The no-action position states that "the Division of Investment Management will not recommend, based on the form of compensation received, that the Commission take any action against a broker-dealer for failure to treat any account over which the broker-dealer does not exercise investment discretion as subject to the [Advisers] Act."  *See* Certain Broker-Dealers Deemed Not To Be Investment Advisers, Release Nos. 34-42099, IA-1845, 1999 SEC LEXIS 2356 at 5 (Nov. 4, 1999) (1999 Rule Proposal).

[7] *See* Pollack Decl., Ex. 3.

Defendants may not have previously considered Advisers Act compliance issues with their broker-dealer compensation arrangements, because they could reasonably rely on the SEC's purported authority to encourage these arrangements.  However, after *Financial Planning Ass'n,* that reliance is no longer reasonable.  AC ¶ 43.  The compliance procedures for the Trust and Eaton Vance Distributors are deficient because, while they are checking to make sure that the broker-dealers are properly registered under the Exchange Act, they are not also checking that there has been a registration under the Advisers Act and that Trust shares are held in a customer account subject to *both* the Exchange Act and the Advisers Act (*i.e.* an "advisory account," rather than a "brokerage account"), prior to making payments of asset-based compensation.  AC ¶¶ 56-64.

### C.      The Payments at Issue

Plaintiff Jeffrey Wiener owns Class C shares of the Eaton Vance National Municipal Income Fund, a series of the Trust, and is therefore a shareholder in the Trust, and has been continuously since May 17, 2007.  AC ¶ 9.  Plaintiff's shares are held in a brokerage account at Robert W. Baird & Co. Incorporated, which provides traditional brokerage services, of which investment advice is an auxiliary component.  AC ¶¶ 9, 21.

The Trust has elected to act as the distributor of its own shares, *see* SEC Rule 12b-1, 17 C.F.R. § 270.12b-1(a)(2), and is financing distribution-related activities out of Trust assets, as allowed by SEC Rule 12b-1, *see* AC ¶ 44, including the broker-dealer payments at issue here, which are accrued daily and paid monthly, calculated based on daily net asset values of the respective Trust shares held in each customer account, and continue for as long as the customer owns Trust shares. AC ¶ 45.[8]

---

[8] Eaton Vance Distributors also makes payments labeled as "marketing support" and/or "administrative services" to broker-dealers based on daily net asset values of shares held in customer accounts, and therefore the "total payments to a broker-dealer servicing a Trust shareholder will be in excess of the rate of 1% per year[.]" AC ¶ 44.

### D.   Recent Development:  The SEC Proposes to Rescind Rule 12b-1

On July 21, 2010, the SEC released for public comment a proposal to rescind Rule 12b-1 in its

entirety.[9]  Under the proposal, Rule 12b-1 will be replaced by new rules that allow the use of fund

assets to pay "transaction-based compensation"[10] to broker-dealers.  The amount of any "deferred

sales load" charged to fund investors can be no higher than the amount of the "reference load," as

defined in the new rules.  The "reference load" is "a specified percentage of the net asset value of the

offering price at the time of purchase[,]"[11] including any breakpoint discounts that the investor is

entitled to receive.[12]

The Release refers to the pendency of this litigation, and also discloses that, beginning in 2007,

numerous prominent experts have urged the SEC to address the Advisers Act violation that occurs

when Rule 12b-1 fees are paid to broker-dealers, in light of *Financial Planning Ass'n*.[13]  In the

Release, the SEC requests public comment on these issues and on whether its proposed new rules will

"appropriately address" the Advisers Act issue "by requiring a nexus between the sale of a share of a

mutual fund and the amount of ongoing sales charges an intermediary's customer pays through the

fund."[14]

### <u>LEGAL STANDARD</u>

"While legal conclusions can provide the framework of a complaint, they must be supported by

factual allegations.  When there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v.*

---

[9] *See* SEC Release Nos 33-9128, 34-62544, IC-29367 (July 21, 2010) (the "Release"), available at
http://www.sec.gov/rules/proposed/2010/33-9128.pdf .

[10] *Id*. at 47 n.168.

[11] *Id.* at 258; Proposed Rule 17 C.F.R. § 270.6c-10(a)(i).

[12] For instance, under the proposal, if an investor would have had to pay a 2% upfront sales load based
on the sales load breakpoint discount schedule in effect for the fund family, then, as an alternative, the
investor could be charged a deferred sales charge that cannot exceed 2% for one year, or 1% for two
years, or 0.50% for four years, for example.

[13] *Id.* at 125 n.372.

[14] *Id*. at 125.

*Iqbal*, 129 S. Ct. 1937, 1950 (2009).  A court "accept[s] as true all well-pleaded facts in the complaint

and draw[s] all reasonable inferences in favor of the plaintiffs."  *Gargano v. Liberty Int'l*

*Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009).

## ARGUMENT

The legal issues raised by defendants' motion are: (i) whether the asset-based compensation

payments to broker-dealers violate the Advisers Act; (ii) if so, whether the Trust's use of Trust assets

for such unlawful payments is proper; (iii) whether the ICA prohibits improper use of Trust assets; and

(iv) whether § 47(b) of the ICA enables the Trust in this lawsuit to void its contractual undertakings to

make payments that conflict with its duty to comply with the ICA.

## I.      THE PAYMENTS AT ISSUE ARE UNLAWFUL

Defendants' insistence that the Advisers Act is "irrelevant" to Rule 12b-1 payments, *see*

Motion at 9, is not a valid substitute for a step-by-step statutory analysis, which begins with the broad

initial definition of "investment adviser."

### A.      All Broker-Dealers Fall Within the Broad
###          Definition of Investment Adviser

The definition of "investment adviser" is "**any person who, for compensation, engages in the**

**business of advising others. . . as to the value of securities or as to the advisability of investing in,**

**purchasing, or selling securities**[.]"  15 U.S.C. § 80b-2(11).  Plaintiff alleges that all broker-dealers

are "investment advisers" because they are in the business of providing investment advice as an

auxiliary component of traditional brokerage services.  AC ¶ 21 (all broker-dealer firms make

securities recommendations, conduct suitability reviews, and otherwise provide investment advice to

their customers).

Plaintiff also alleges that all of the broker-dealers selling or servicing Trust shares received

"compensation" in connection with accounts holding Trust shares.  *See* AC ¶ 44-45.  The

compensation element is satisfied by *any economic benefit* received in connection with a customer

account to which investment advice is included in the package of services provided, including any

third-party payments.  *See* SEC Release No. IA-1092, 1987 SEC LEXIS 3487, at *14-15 (October 8, 1987).[15]  Accordingly, the label on the fee, the purpose of the fee, the intent of the fee, the form of the fee, and the source of the fee are all legally irrelevant.  If investment advice is part of the package of services provided to an account, then any compensation received in connection with that account is considered to be compensation for investment advice.[16]  The only issue remaining is whether a statutory exclusion applies.

### B.   The Broker-Dealer Exclusion Is Inapplicable If Asset-Based Compensation Is Received

Although it is not plaintiff's burden to plead and prove the non-applicability of every possible statutory exclusion,[17] plaintiff alleges that the statutory Broker-Dealer Exclusion to the definition of "investment adviser" is inapplicable to broker-dealers receiving the asset-based compensation payments at issue.  *See* AC ¶¶ 20-34.  The Broker-Dealer Exclusion excludes certain broker-dealers from being deemed to be investment advisers, *i.e.,* "**any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor**."  15 U.S.C. § 80b-2(11)(C).[18]

---

[15] *See also College Resource Network*, 1993 SEC No-Act. LEXIS 630 at *4 (Apr. 9, 1993) (third-party payments are "compensation"); *In re O'Brien Partners, Inc.*, Sec. Act Release No. 7594, IA-1772, 1998 SEC LEXIS 2318 at *21, *25 (Oct. 27, 1998) (there is no requirement that compensation be paid directly by the person receiving the investment advice).

[16] Similarly, a registered investment adviser that executes securities transactions must become a dual registrant (*i.e.,* register as a broker-dealer), irrespective of whether the investment adviser is receiving no compensation specifically for the transactions.  *See PRA Sec. Advisors, L.P.*, 1993 SEC No-Act. LEXIS 387 (Mar. 3, 1993) (investment adviser receiving only asset-based compensation must nevertheless register as a broker-dealer if executing securities transactions).

[17] The general rule is that the party claiming the benefits of a statutory exclusion has the burden of proving its applicability.  *See United States v. First City Nat'l Bank*, 386 U.S. 361, 366 (1967).  Accordingly, in this case, it is defendants' burden to prove that the Broker-Dealer Exclusion applies, if defendants rely on it.

[18] A 1946 SEC opinion letter states that "the broker-dealer exception 'amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business and that it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business.'"*See* 2005 Final Rule Release, 70 Fed. Reg. at 20424, 20425 (April 19, 2005), *quoting Opinion of the General Counsel Relating To Section 202(a)(11)(C) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2 (Oct. 28, 1940), 11 Fed. Reg. 10996 (Sept. 27, 1946).

10

Failure to satisfy *either* the "solely incidental" or "no special compensation" prongs renders the Broker-Dealer Exclusion inapplicable. These terms are not defined in the statute, but for 70 years, the SEC and the courts have given those terms consistent meanings, based on what Congress intended by that language in 1940.

The term **"solely incidental"** means "the advisory services rendered to an account are in connection with and reasonably related to the brokerage services provided to that account. This understanding is consistent with the legislative history of the Advisers Act, which indicates Congress' intent to exclude broker-dealers providing advice as part of traditional brokerage services." *See* SEC Release No. IA-2340, 2005 SEC LEXIS 25 at *70 (Jan. 6, 2005).

The term **"no special compensation"** means the broker-dealer may not receive any form of compensation other than transactional commissions. *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (§ 202(a)(11)(C) of the Advisers Act applies to broker-dealers "insofar as their advice is merely incidental to **brokerage transactions for which they receive *only* brokerage commissions**") (emphasis added).[19]

A broker-dealer firm may, if it wishes, comply with the Advisers Act by registering as an investment adviser (the firm is then commonly referred to as a "dual registrant"). After enactment of the Advisers Act in 1940, many broker-dealers became dual registrants, and a large percentage are dual registrants today. The Advisers Act's applicability has always been determined on an account-by-account basis. *See* SEC Release No. IA-2652, 2007 SEC LEXIS 2229 at *7 (Sept. 24, 2007) (proposal to codify a long-standing SEC interpretation that a broker-dealer "**is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker-dealer to the Advisers Act**."). Accordingly, *either* providing certain services

---

[19]   The "no special compensation" prong of the Broker-Dealer Exclusion has been referred to as a "bright-line" test. *See* 2005 Final Rule Release, 70 Fed. Reg. at 20431 n.76. Special compensation means the receipt of any non-transactional compensation. *Id.* at n.75 ("At the time the Advisers Act was enacted, Congress understood 'special compensation' to mean compensation *other than* commissions.") (emphasis in original).

(such as a discretionary account), *or* receiving any compensation other than transactional commissions, will disqualify an account for the Broker-Dealer Exclusion.[20]

The payments at issue here are not transactional "commissions," as Congress understood that word in 1940,[21] because they are *not one-time* payments calculated as a percentage of a *transaction* price. *See* 15 U.S.C. § 80a-2(a)(35) (definition of sales load in the ICA). Defendants rely on the terminology of NASD Rule 2830, which refers to Rule 12b-1 fees as an "asset based sales charge," to suggest that the SEC and NASD (now FINRA) treat the charges as the means to finance a sales load "over a period of several years." Motion at 9, quoting *Yameen v. Eaton Vance Distributors, Inc.*, 394 F. Supp. 2d 350, 354 (D. Mass. 2005). Defendants' reliance on this Court's opinion in the *Yameen* excessive fees case is misleading because the purported facts in that case – *i.e.* that Eaton Vance Distributors advanced a one-time sales commission to the broker-dealer at the time of the sale, and then recouped that advance through Rule 12b-1 fees *that terminated for each shareholder when the commission was recovered, see id.* at 352-53 – are not the facts here.

Moreover, the "asset-based sales charge" terminology in NASD Rule 2830 originated when Rule 12b-1 was used to recoup transactional commissions advanced to broker-dealers, and pre-dates the innovation of asset-based compensation arrangements (at issue in this case) that have unlimited durations, with no nexus to a transactional charge, and that are paid directly to broker-dealers.[22] In

---

[20] The SEC has consistently found any non-transactional compensation to be "special compensation." *See Hugh Johnson & Co.*, 1976 SEC No-Act. LEXIS 420 (Feb. 22, 1976) (account fee of 0.25% per year); *In re: Quest Capital Strategies, Inc.*, 1999 SEC LEXIS 727 at *42 (Apr. 12, 1999) (retention of interest rate spread); *Calton & Assocs, Inc.,* 1988 SEC No-Act. LEXIS 1348 (Oct. 11, 1988) (2.5% per year of net asset value for market timing service); *CFS Securities Corp.*, 1987 SEC No-Act. LEXIS 1663 (Feb. 27, 1987) (fee of $39 for customer to attend a seminar is "special compensation" that disqualifies broker-dealer from invoking the broker-dealer exclusion to the Advisers Act).

[21] The third edition of Black's Law Dictionary published in 1933 defines "commission" as "recompense or reward of an agent, factor, broker, or bailee, when the same is calculated as a percentage on the amount of his transactions or on the profit to the principal." Pollack Decl., Ex. 4.

[22] The SEC explained, in its original 1988 release of a proposed rule to limit 12b-1 fees (the pre-cursor to what became NASD Rule 2830), that the "asset-based sales load" terminology was not intended to imply that 12b-1 fees were a sales load. *See* SEC Release No. IC-16431, 53 Fed. Reg. 23258 (June 21, 1988) (use of term "asset-based sales load" does not bring 12b-1 payments within the term "sales load" as defined in the ICA, but rather is solely "directed at the investor confusion that has arisen regarding payments for distribution under the rule").

addition, defendants' argument ignores the fact that the payments at issue here are disconnected from a sale -- the shareholders can direct the ongoing payments to any broker-dealer, irrespective of which broker-dealer made the sale.  *See* Pollack Decl., Ex. 5 (change of dealer form).

Nothing in NASD Rule 2830 imposes any shareholder-level limit on the duration of 12b-1 fees. There is a fund-level cap (which as a practical matter is never reached if the fund is open for business), but there is no limit to the duration or cumulative amount shareholders will pay (as defense counsel admit in an article posted to their web site shortly after submitting their brief to this Court).  *See* Pollack Decl., Ex. 6 (article from K&L Gates web site dated July 30, 2010).

As the SEC has stated: "**Mutual fund fees are of two types, transactional (e.g., sales loads, redemption fees) and ongoing (e.g., asset-based charges such as management fees and 12b-1 fees)**."   SEC Release No IC-26372, 2004 SEC LEXIS 474 at *10 (Feb. 27, 2004).  The Rule 12b-1 payments at issue here are plainly of the "ongoing" type, and are not "transactional."

The authorities defendants rely on support plaintiff because each involves a holding that the broker-dealer received only commissions (transactional payments calculated on the price of a purchase or sale of securities).  *See Thomas v. Metropolitan Life Ins. Co.*, No. 07-121, 2009 U.S. Dist. LEXIS 78014 (W.D. Okla. Aug. 31, 2009) at *16, *27 (commission calculated on purchase price of variable life insurance, holding that there was no "charge to the customer beyond a traditional commission"); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 34 (S.D.N.Y. 2008) (plaintiffs were retail customers who paid transactional commissions to purchase auction rate securities, income received by a separate underwriting department at UBS was not in connection with retail customer account); *Luzerne County Retirement Board v. Makowski*, 627 F. Supp. 2d 506, 573 n.71 (M.D. Pa. 2007) ("Plaintiff itself characterizes all of the compensation received by [broker-dealer] as commissions on investments" and court proceeded on that basis); *Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 464 F. Supp. 528, 538 (D. Md. 1978) (broker-dealer received only transactional commissions and therefore satisfied the "no special compensation" prong).

13

Defendants' argument that their asset-based payments should be deemed to be ("functionally") transactional commissions tacitly concedes that the law is clear that broker-dealers may not receive asset-based compensation.  *See Financial Planning Ass'n,* 482 F.3d. at 488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.**") (emphasis added).  In *Financial Planning Ass'n*, the court majority, the dissenting judge, and the SEC were all in agreement that asset-based compensation is "special compensation" and is the subject of the statutory bar.  *Id*. at 488, 494 ("a broker-dealer who receives any kind of compensation other than commissions does not come within the [Broker-Dealer Exclusion], even if he, too, provides advice solely as an incident to his business as a broker-dealer.").[23] Moreover, Congress subsequently declined to amend the Broker-Dealer Exclusion to remove the ban on "special compensation," despite an aggressive lobbying campaign.[24]

Accordingly, there is *no colorable basis,* in the wake of those developments, for defendants to argue here that broker-dealers may receive non-transactional compensation in connection with brokerage accounts.

## II.     UNLAWFUL PAYMENTS ARE AN IMPROPER USE OF TRUST ASSETS

The Amended Complaint alleges that the core purpose of the ICA is to prevent the improper use of Trust assets.  *See* AC ¶¶ 59-65.  Defendants do not dispute that the Trust, the Trustees, and Eaton Vance Distributors are directly regulated parties under the ICA, subject to § 36(a), which sets forth a statutory fiduciary duty to act in the best interests of the Trust and its shareholders.[25]

---

[23] *See also* Arthur B. Laby, *Reforming the Regulation of Broker-Dealers and Investment Advisers,*" 65 Bus. Law. 395, 417 (Feb. 2010) ("As a technical matter, the receipt of asset-based compensation has made the broker-dealer exclusion inapplicable to brokers receiving such compensation.  After the *Financial Planning Ass'n* decision, asset-based fees must be considered 'special compensation,' which vitiates application of the exclusion.").

[24] Burke, "The Hot Seat," *Registered Representative* at 44 (Sept. 2007) (Pollack Decl., Ex. 7).

[25] Although the provision speaks only of the SEC's authority to file civil actions for breach of fiduciary duty, it implicitly codifies the duty, because the SEC could not enforce a duty that does not exist.  *See*

Defendants argue is that there are no private rights of action for damages under the ICA, but that fact is irrelevant, because the regulated parties have a statutory obligation to comply with the ICA, irrespective of its remedy for enforcement or breach.

Defendants also argue that § 36(a) is not a substantive provision that can be violated, but defendants' authority only holds that the SEC must, as stated in the statute, enforce the provision in federal district court rather than in an administrative proceeding.  Failure to comply with § 36(a) is a violation of the statute. *See, e.g.*, *SEC v. Treadway*, 430 F. Supp. 2d 293, 340-46 (S.D.N.Y. 2006) (analysis denying defendants' motions for summary judgment in connection with claims for violations of § 36(a)); In re *Steadman Security Corp.*, 1983 SEC No-Act. LEXIS 2238 (Apr. 18, 1983) (improper use of mutual fund assets will result in violation by trustees of § 36(a)).

The oversight role of the Trustees includes compliance with SEC Rule 38a-1, promulgated under the ICA,[26] which reinforces the § 36(a) fiduciary duty by requiring the Trustees to adopt written compliance programs for the Trust, *and to review and approve the compliance programs of the service providers, including Eaton Vance Distributors*.  The compliance programs must be designed to prevent, detect and correct violations of the federal securities laws by service providers.  17 C.F.R. § 270.38a-1.  "Federal securities laws" is specifically defined to include the Advisers Act.  All of defendants' arguments about Rule 38a-1 ignore or misstate this basic structure, and ignore that the purpose of these requirements is to stop Trust assets from being used in violation of the federal securities laws.[27]

---

*Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) ("the Act implicitly established a federal standard of fiduciary duty").

[26] *See* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980, at *6 (Dec. 17, 2003) ("Rule 38a-1 Promulgating Release") (stating that SEC Rule 38a-1 was adopted following a series of scandals that rocked the mutual fund industry in 2003 in which service providers to some mutual funds were discovered to be entering into improper and illegal arrangements involving fund assets in breach of their obligations under § 36(a)).

[27] The promulgating release for Rule 38a-1 clarifies that "[s]erious compliance issues must, of course, always be brought [by the Chief Compliance Officer] to the board's attention promptly, and cannot be delayed until an annual report."  2003 SEC LEXIS 2980 at *51 n.84.

In addition, the customers -- who are being deprived of accounts subject to the investor protections of the Advisers Act to which they are entitled by law -- are the same persons who are the shareholders of the Trust to whom the Trustees and Eaton Vance Distributors owe a fiduciary duty of care. Accordingly, the Trustees and Eaton Vance Distributors have a duty under the ICA not to use Trust assets to make payments in violation of the Advisers Act, and defendants have offered no basis to conclude otherwise.

## III.   DEFENDANTS' DUTIES UNDER THE ICA TRUMP THEIR CONTRACTUAL ARRANGEMENTS TO MAKE UNLAWFUL PAYMENTS

### A.   Section 47(b) Permits Actions for Rescission and Restitution

Section 47(b) of the ICA ("Validity of Contracts"), 15 U.S.C. § 80a-46(b), plainly states that "either party" may void a contract "whose performance involves" a violation of "any provision" of the ICA or any rule, regulation or order thereunder. The statute refers to "a court" as the tribunal that voids an offending contract. Accordingly, contractual obligations that conflict with a regulated party's duties under the ICA are voidable by a court. Section 47(b) has nearly identical counterparts in the other securities laws.[28]

Defendants seek to change the plain language of these contract voiding statutes. They contend that voiding a contract "whose performance involves" a violation of the ICA, or a rule, etc., thereunder, requires that the underlying violation *itself be prosecuted in a private right of action. See* Motion at 10-11. Defendants fail to mention that their argument was considered and rejected in a controlling Supreme Court decision that is directly on point. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979). The Supreme Court held that the contract voiding provision of the Advisers Act allows for an independent right of action for rescission and restitution, *irrespective of the fact that there are no private rights of action for damages under any provision of the Advisers Act or any rule, regulation or order thereunder.*

---

[28] *See* § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), and § 215(b) of the Advisers Act, 15 U.S.C. § 80b-15.

For the present analysis, there is no basis for distinguishing between contract voiding under the Advisers Act (*Transamerica*) and the ICA (this case).  The contract voiding provisions of the federal securities laws have always been construed *in pari materia*, and *Transamerica* has been consistently followed.  There are seven decades of authorities directly contrary to defendants' argument,[29] and an SEC amicus brief on § 47(b), all on point.[30]

Defendants' arguments would render the enactment of § 47(b) a statutory nullity, because the ICA did not contain any private rights of action for damages in 1940.  Moreover, defendants' arguments ignore that Congress demonstrated, in the counterpart section of the Exchange Act (§ 29(b)), that it knew how to exclude certain predicate provisions.  *See* 15 U.S.C. § 78cc(b) (excluding predicate provision, and providing for a special statute of limitations period for another predicate provision, none of which have any private right of action to enforce them).  Moreover, in § 29(b), Congress states that "no contract shall be deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection [filed after the statute of limitations period]," which, in its own plain words, shows that Congress intended to create a private right of action for contract voiding under these contract voiding statutes.

---

[29] *See, e.g.*, *GFL Advantage Fund, Ltd v. Colkitt*, 272 F.3d 189, 206 n.6 (3d Cir. 2001) (contract voiding provision does not require maintenance of private suit under the predicate statute violated) *Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 208 (3d Cir. 2006) (same); *Rhoades v. Powell*, 644 F. Supp. 645, 661-64 (E.D. Cal. 1986) (extensive analysis of the contract voiding statute in the Exchange Act); *Roberts v. Smith Barney Harris Upham & Co.*, 653 F. Supp. 406, 414 (D. Mass. 1986) ("section 29(b) creates substantive rights to void a contract that are independent of the rights created by section 15(c)(1)"); *Couldock & Bohan, Inc. v. Societe Generale Securities Corp.*, 93 F. Supp. 2d 220, 231 (D. Conn. 2000) (numerous violations of Exchange Act provisions supporting contract voiding); *Margaret Hall Foundation, Inc. v. Atl. Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1485 (D. Mass. 1983) (fact that predicate statute has no private right of action for damages is irrelevant to contract voiding action for rescission and restitution); *Franklin Nat'l Bank v. L.B. Meadows & Co.*, 318 F. Supp. 1339, 1341 (E.D.N.Y. 1970) (listing § 47(b) among "[o]nly few sections of the various Securities Acts [that] provide explicitly for private actions"); *Freeman v. Marine Midland Bank-New York*, No. 71-42, 1979 U.S. Dist. LEXIS 12177, at *5-6 (E.D.N.Y. May 24, 1979) (whether there is a private right of action for damages under the predicate statute is irrelevant).

[30] *See* Brief of the SEC, Amicus Curiae, Submitted at the Court's Request (Dec. 5, 2001) at Section II, filed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), *available at* www.sec.gov/litigation/briefs/olmsted.htm (§ 47(b) of the ICA provides distinct cause of action irrespective of whether predicate statute in the ICA alleged to be violated contains any express or implied private right of action for damages).

The purpose of the contract voiding provisions is to ensure that private contractual obligations do not trump the statutory and regulatory obligations of regulated parties. The contract voiding statutes promote compliance with the law. The provision is limited to rescission and restitution, and does not allow for recovery of damages. This is yet another reason why the gloss that defendants seek to add to the statute is contrary to the entire statutory scheme.

Defendants cite *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005), where this Court dismissed a § 47(b) claim, but under the circumstance where a plaintiff that was not suing derivatively, and thus had no standing under § 47(b), frivolously sought to invoke it as a remedy. The plaintiff's § 47(b) claim was appropriately dismissed, as was every other identical case filed by that same law firm.[31] The *dicta* cited by defendants does not purport to state the law and essentially reflected the plaintiff's voluntary dismissal, with no occasion to review the Supreme Court's decision in *Transamerica*.

Next, defendants argue that, contrary to the plain language of § 47(b), contract performance that involves a violation of the ICA cannot support a claim for contract voiding, but the law is well established otherwise. *See Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982) (a compensation agreement with a broker-dealer was lawful on its face, but the broker-dealer was not registered, and therefore the agreement could not be performed without violating the securities laws). As the court in *Regional Properties* observed in rejecting the defendant's argument: "A statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the congressional time spent in its enactment." *Id*.

Finally, defendants argue that § 38(c) of the ICA, which precludes liability arising out of good faith reliance on a regulation subsequently invalidated, is a "complete defense" because they complied

---

[31] *See  Everett v. Bozic*, No. 05-296, 2006 U.S. Dist. LEXIS 55824, at *3 (S.D.N.Y. Aug. 2, 2006) (another of "more than 40 virtually identical actions filed by Plaintiffs' counsel" and dismissing the § 47(b) count for failure to plead as a derivative action).

with Rule 12b-1.  Motion at 13.  However, Rule 12b-1 has not been invalidated, and Rule 12b-1 is not going to be invalidated by this lawsuit.  Defendants never make any showing that there is any conflict between Rule 12b-1 and the Advisers Act, or as to why they cannot easily comply with both. Defendants' compliance procedures recognize that Rule 12b-1 payments must comport with the Exchange Act (requiring broker-dealers to register before receiving compensation).  The Advisers Act is no less important of a law.

### B.      The State Law Contract-Voiding Count Is Not Preempted

Defendants argue that the Second Count for contract voiding under Massachusetts common law is subject to both field preemption and conflict preemption, *see* Motion at 13-16, but they are wrong on both.  *See Green v. Fund Asset Management, L.P.*, 245 F.3d 214, 222-30 (3d Cir. 2001) (no conflict preemption between state law claims and the ICA); *In re: Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 552-54 (N.D. Cal. 2009) (state law claims arising from violations of the ICA are not preempted); *see also Hayes v. Ellrich*, No. 06-3815, 2009 Mass. Super. LEXIS 188 at *9-*12 (Sup. Ct. Suffolk July 13, 2009) (Advisers Act does not preempt state law claims).

Defendants' reliance on *Kelly v. Kosuga*, 358 U.S. 516 (1959) (antitrust law), is misplaced.  *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81-82 (1982) (distinguishing *Kosuga*; "the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the antitrust laws forbid"); *see also Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc.*, 988 F.2d 288, 290-91 (1st Cir. 1993) (invalidating contract with broker not properly licensed by the Interstate Commerce Commission).  A recent Massachusetts case contains an extensive analysis of a claim for contract voiding under Massachusetts law arising from violations of the accredited-investor federal securities regulations (Regulation D) under the Securities Act of 1933, s*ee Frishman v. Maginn*, 912 N.E.2d 468, 476-80 (Mass. App. 2009), and rejects the same arguments defendants make here.

**IV.    THE COURT SHOULD EXERCISE EITHER FEDERAL QUESTION OR
        SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS**

Each of the state law claims (Counts II-V) is before this Court on the basis of "arising-under"
federal question jurisdiction.  AC ¶ 6; *see Rhode Island Fishermen's Alliance, Inc. v. Rhode Island
Dept. of Environmental Management*, 585 F.3d 42, 48 (1st Cir. 2009) (federal question jurisdiction
includes state law claims where "plaintiff's right to relief necessarily depends on resolution of a
substantial question of federal law").  Alternatively, the Court may exercise supplemental jurisdiction if
Count I  (contract voiding under § 47(b)) is sustained.  AC ¶ 6.

Defendants' challenge to the adequacy of the state law claims for breach of contract and, as
against the affiliated trustee, for breach of fiduciary duty and waste, rests on the supposed legality of
the payments at issue under federal law.  Motion at 16-17.  As discussed above, plaintiff has
adequately alleged, on behalf of the Trust, that the payments are unlawful, that the Distribution
Agreement, which is the contractual source of the obligation to make the payments, is voidable, and
that Eaton Vance Distributors is participating in the violations of the ICA and Advisers Act in the sale
and service of Trust shares, in contravention of a contractual warranty to conform to the requirements
of the law, causing harm to the Trust and its shareholders, who are entitled as a matter of law to
advisory accounts.  Defendants' arguments to the contrary are without merit.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.


DATED:  August 20, 2010                                 MILBERG LLP


                                        _____/s/  Janine L. Pollack___
                                        Michael C. Spencer
                                        mspencer@milberg.com
                                        Janine L. Pollack
                                        jpollack@milberg.com
                                        One Pennsylvania Plaza
                                        New York NY  10119
                                        Telephone:  (212) 594-5300
                                        Facsimile:   (212) 868-1229

20

Glen DeValerio
gdevalerio@bermandevalerio.com
BERMAN DEVALERIO
One Liberty Square
Boston, MA 02109
Tel:  (617) 542-8300
Fax: (617) 542-1194

Lee A. Weiss
lweiss@bwgfirm.com
BROWNE WOODS GEORGE LLP
1 Liberty Plaza, Suite 2329
New York, NY  10006
Tel:  (212) 354-4901
Fax: (212) 354-4904


Ronald A. Uitz
ron877@yahoo.com
UITZ & ASSOCIATES
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:   (202) 521-0619


Richard J. Lantinberg, Esq.
RLantinberg@whmlegal.com
WILNER HARTLEY & METCALF, P.A.
444 E. Duval Street
Jacksonville, FL  32202
Telephone: (904) 446-9817
Facsimile: (904) 446-9825

**_Attorneys for Plaintiff_**

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2010 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Ryan M. Tosi
ryan.tosi@klgates.com

Charles L. Eisen *(admitted pro hac vice)*
charles.eisen @klgates.com *(admitted pro hac vice)*

Jeffrey B. Maletta
Jeffrey.maletta@klgates.com

   /s/   Janine L. Pollack      
Janine L. Pollack

22