UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JEFFREY WIENER, derivatively on behalf )
of EATON VANCE MUNICIPALS TRUST,      )
                                       )
      Plaintiff,                       )
                                       )
v.                                     )
                                       )
EATON VANCE DISTRIBUTORS, INC.,        )
BENJAMIN C. ESTY, ALLEN R. FREEDMAN,   )   CIVIL ACTION NO.
WILLIAM H. PARK, RONALD A. PEARLMAN,   )   10-10515-DPW
HELEN FRAME PETERS, HEIDI L. STEGER,   )
LYNN A. STOUT, RALPH F. VERNI, and     )
THOMAS FAUST                           )
                                       )
      Defendants,                      )
                                       )
and                                    )
                                       )
      EATON VANCE MUNICIPALS TRUST,    )
                                       )
      Nominal Defendant.               )
                                       )

MEMORANDUM
March 30, 2011

      This shareholder derivative action was brought by plaintiff

Jeffrey Wiener on behalf of nominal defendant Eaton Vance

Municipals Trust (the "Trust") against Eaton Vance Distributors,

Inc. ("Distributors") and the Trust's nine trustees (the

"Trustees"), specifically the eight independent trustees (the

"Independent Trustees") and one interested trustee.

      Plaintiff alleges that "Rule 12b-1" distribution fees paid

by the Trust to Distributors, and subsequently to individual

broker-dealers who distribute shares in a mutual fund of the

Trust, violate the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.,* ("the Advisors Act").  Plaintiff asserts a claim against Distributors for contract voiding under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.,* (the "Investment Company Act") and several claims against both Distributors and the Trustees under Massachusetts state law for injunctive relief and damages.

The Trust and the Independent Trustees move for dismissal under Rules 9(b), 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure.  Distributors and the interested trustee separately move for dismissal under Rule 12(b)(6).

## I.  BACKGROUND

### A.  *Parties*

Plaintiff Jeffrey Wiener is a resident of Florida and is invested in Class C shares of the Eaton Vance National Municipal Income Fund (the "Fund"), a series of the Trust.  Am. Compl. ¶ 9. Weiner is therefore a shareholder in the Trust and has been continuously since May 17, 2007.  *Id*.  He holds his shares in a brokerage account at Robert W. Baird & Co. Incorporated.  *Id*.

The nominal defendant in this derivative action is the Trust, which is a Massachusetts business trust maintaining a principal place of business in Massachusetts.  *Id*. ¶ 10.  The Trust is a series-type open-end management investment company regulated under the Investment Company Act.  *Id*.  The Fund is one

of twenty-five separate series, or mutual funds, that comprise the Trust.  *Id.* ¶¶ 9-10.

Defendant Distributors is a Massachusetts corporation and a wholly-owned subsidiary of Eaton Vance Corporation.  *Id.* ¶ 19. Distributors acts as the principal underwriter and distributor for shares in the Trust and is a broker-dealer member of the Financial Industry Regulatory Authority (FINRA).  Pursuant to a Distribution Agreement with the Trust, Distributors enters into selling agreements with retail broker-dealers who in turn act as agents for Distributors and the Trust in distributing shares of the Trust to the public.  *Id.*

The individual defendants are the nine trustees of the Trust's Board.[1]  Eight of the nine trustees have been classified by the Trust as independent for purposes of the Investment Company Act.[2]  *Id.* ¶¶ 11-18.  The independent trustees are:

_____

[1]  Neither the original Verified Derivative Complaint nor the Amended Complaint list one of the trustees, Lynn A. Stout, as a defendant in the body of the complaint.  However, the captions of both complaints contain her name, indicating that the omission in the body was inadvertent.  Stacey B. Ardini, Esq. entered an appearance as counsel for the Trust and trustees, including Ms. Stout.  Ms. Stout joined the Motion by the Independent Trustee Defendants and Nominal Defendant Eaton Vance Municipals Trust to Dismiss the Verified Compliant, and the Motion by the Independent Trustee Defendants and Nominal Defendant Eaton Vance Municipal Trust to Dismiss the Amended Complaint.

[2]  As noted in footnote 1, Ms. Stout was not addressed in the narrative of plaintiff's complaints.  This memorandum relies on information provided in the Memorandum of the Independent Trustees and the Trust in support of their Motion to Dismiss Plaintiff's Amended Complaint in classifying Ms. Stout as an

Benjamin C. Esty, Allen R. Freedman, William H. Park, Ronald A. Pearlman, Helen Frame Peters, Heidi L. Steiger, Lynn A. Stout, and Ralph F. Verni (collectively, the "Independent Trustees"). *Id.* The ninth trustee, Thomas E. Faust Jr., is classified by the Trust as "interested" under the Investment Company Act.[3]  *Id.* ¶ 18.

## B.   *Factual Background*

The Trust entered into a Distribution Agreement dated June 23, 1997 with Distributors, pursuant to which the Trust pays Distributors certain fees for distributing its shares. *Id.* ¶ 44. The fees are of a type generally referred to as "Rule 12b-1 fees" or "12b-1 fees" after the SEC rule, 17 C.F.R. § 270.12b-1, authorizing and regulating such payments by investment companies. *See* Am. Compl. ¶¶ 44-50. *See generally* Section I.C.1, *infra.* Distributors then enters into selling agreements with retail broker-dealers who sell the Trust's shares to individual investors. *Id.* ¶¶ 19, 44.

---

independent trustee.  Despite Plaintiff's apparently inadvertent error to identify Ms. Stout as a defendant expressly in the body of the complaint, I will consider her a defendant and address the motion to dismiss in that light.

[3] Mr. Faust is President and Chief Executive Officer of Boston Management and Research, an adviser of the Trust.  Mem. Law Indep. Tr. Defs. Nominal Def. at 3-4.  The Investment Company Act includes in the definition of an "interested person," when used with respect to an investment company, "any affiliated person of" "any investment adviser of or principal underwriter for such company."  15 U.S.C. §§ 80a-2(a)(19)(A)(iii),(B)(I).

The Trust pays 12b-1 fees to the distributors of its shares, including Class C shares in the Fund, according to Distribution Plans or "Rule 12b-1 Plans." *Id*. ¶ 44.  The Distribution Plans vary by share class; for example, the Class C Distribution Plan provides for distribution charges and service fees at a total rate equal to 1% per annum of net assets. *Id*.  The Trust's Distribution Agreement with Distributors provides that 12b-1 fees for Class C shares in the Fund will accrue daily and be paid monthly by the Trust. *Id*. ¶ 45.  Distributors allocates the fees to individual broker-dealers based on the daily net asset value of Class C shares held in each individual investor's account. *Id*.  The payments are made to a broker-dealer as long as the customer holds Class C Trust shares in the broker-dealer's account. *Id*.  In addition, Distributors also makes marketing support and/or administrative services payments to broker-dealers based on the value of shares held in customer accounts, and so the total payments to a broker-dealer servicing a Class C shareholder exceed 1% per year of average daily net assets. *Id*. ¶ 44.

In this memorandum, I follow the lead of the Amended Complaint and refer to the ongoing, percentage-based 12b-1 fee as an "asset-based fee" or as "asset-based compensation."  This type of fee is paid to the broker-dealer on an ongoing basis as long as the Class C shares are in the account; an "asset-based fee" is

to be distinguished from a "transactional fee," which is a one-
time, up-front fee.  A broker-dealer receives a transactional fee
at the time a mutual fund's shares are purchased, and the fee is
usually calculated as a percentage of the value of the purchase.
*Id.* ¶ 33.

Plaintiff sent a letter dated September 17, 2009 to the
Trust's Board alleging that the "[p]ayment of Asset-Based
Compensation to broker-dealers in connection with brokerage
accounts is unlawful."  Am. Compl., Ex. 1 at 2.  In that letter,
the Plaintiff asked the Board to take certain corrective actions
with regard to the violations alleged to have occurred.  *See* Am.
Compl., Ex. 1.  In particular, the letter demanded that the
Trustees: "(a) cause the Trust to cease funding and permitting
the payment of ongoing non-transactional asset-based compensation
. . . to broker-dealers in connection with Trust shares held in
brokerage accounts . . . and (b) take all necessary and
reasonable steps to restore to the Trust all past payments of
such Asset-Based Compensation."  *Id.* at 1.  The Board responded
by a letter dated February 8, 2010 declining to take any action
and stating that "the Board has considered these matters
thoroughly and has determined, in the exercise of its reasonable
business judgment, that the payments identified in the Demand
Letter do not result in violations of law and that it would not
be in the best interests of the Trust or its shareholders to take

the actions identified in the Demand Letter."  Am. Compl., Ex. 2.
at 1.  Plaintiff thereupon filed a verified derivative complaint
commencing this action.

**C.    *Legal Background***

    1.    <u>The Investment Company Act and Rule 12b-1 Fees</u>

       The Investment Company Act authorizes investment companies,
such as the Trust, to act as distributors of their own
securities.  15 U.S.C. § 80a-12(b).  Through Rule 12b-1, the SEC
has determined that a trust acts as a distributor "if it engages
directly or indirectly in financing" activities "primarily
intended to result in the sale of shares issued by" the Trust,
including "compensation of . . . dealers."  17 C.F.R. § 270.12b-
1(a)(2).  Rule 12b-1 authorizes and regulates the payment of fees
to broker-dealers by investment companies that elect to
distribute their own shares.  *Id*. § 270.12b-1.

    Among other restrictions, Rule 12b-1 requires an investment
company paying 12b-1 fees to have a written plan ("Distribution
Plan") for paying the fees.  *Id*. § 270.12b-1(b).  The
Distribution Plan must be approved by a majority of outstanding
voting securities, and the plan and any related written
agreements must be approved by a vote of the board and of the
non-interested board members.  *Id*.

    2.    <u>The Advisers Act's Regulation of Investment Advisers</u>

       Separately from the Investment Company Act, the Advisers Act

regulates the activities of investment advisers.  The Advisers
Act accomplishes this by mandating registration, record-keeping,
reporting, and the adoption of policies and procedures to prevent
violations of securities laws and regulations; imposing
limitations on compensation arrangements; and prohibiting
participation in certain activities.  *See generally* 15 U.S.C. §
80b-1 *et seq*.  The purpose of the Advisers Act is to protect
clients of investment advisers and the investing public as a
whole.  *See* S. Rep. No. 76-1775, at 21-22 (1940) (including among
the reasons for regulating investment advisers: "potential
influence on securities markets," "dangerous potentialities of
stock market tipsters imposing upon unsophisticated investors,"
and the entering into of "profit-sharing contracts which are
nothing more than 'heads I win, tails you lose' arrangements").

Plaintiff argues that the Rule 12b-1 fees paid by the Trust
to Distributors, and subsequently to other broker-dealers, for
the distribution of Class C shares of the Fund qualify the
broker-dealers as "investment advisers" under the Advisers Act
with respect to those customer accounts holding Class C shares.
The Advisers Act defines an "investment adviser" as "any person
who, for compensation, engages in the business of advising
others, either directly or through publications or writings, as
to the value of securities or as to the advisability of investing

in, purchasing, or selling securities."[4]   15 U.S.C. § 80b-
2(a)(11).   There are seven exemptions from the definition for
certain individuals, for example, lawyers whose activities may
otherwise qualify an individual as an "investment adviser."   *Id.*
One other such exemption is for "any broker or dealer whose
performance of such [advisory] services is solely incidental to
the conduct of his business as a broker or dealer and who
receives no special compensation therefor."   *Id.* § 80b-
2(a)(11)(C).   The statute also provides an exemption for "such
other persons not within the intent of this paragraph, as the
Commission may designate by rules and regulations or order."   *Id.*
§ 80b-2(a)(11)(G).

Plaintiff argues that broker-dealers who sell Class C shares
in the Fund meet the Advisers Act's definition of "investment
adviser," and are not exempt because (1) the broker-dealers
engage in the business of advising their customers and (2) they
receive "special compensation" in the form of asset-based 12b-1
fees.   Plaintiff contends that payments by the Trust of asset-
based compensation constitute violations of the Advisers Act
because the broker-dealers selling Class C shares are not

---

[4] Broker-dealers are regulated under the Securities Exchange
Act of 1934, 15 U.S.C. § 78a *et seq.*, which defines a broker as
"any person engaged in the business of effecting transactions in
securities for the account of others," *id.* § 78c(a)(4), and a
dealer as "any person engaged in the business of buying and
selling securities for such person's own account through a broker
or otherwise."   *Id.* § 78c(a)(5).

registered as investment advisers with respect to customer accounts holding Class C shares in the Trust's Fund.

## II. DISCUSSION

The Trust and the Independent Trustees move for dismissal under Rules 23.1, 12(b)(6), and 9(b), of the Federal Rules of Civil Procedure, and Distributors and the interested trustee separately move for dismissal under Rule 12(b)(6).  As a threshold matter, I consider the challenge under Rule 23.1 - which I reject - before turning to the challenges made under 12(b)(6), which I find well supported.  Having found that the case must be dismissed under Rule 12(b)(6), I have no occasion to consider the challenge specifically under Rule 9(b), which seems in any event a variation on the theme of the Rule 12(b)(6) challenge.

### A.   *Pleading Requirement for Derivative Actions Under Rule 23.1*

The Independent Trustees and the Trust argue that Plaintiff's complaint does not comply with the Rule 23.1 pleading requirement for derivative actions.  Rule 23.1 requires a derivative complaint to "state with particularity: (A) any efforts by the plaintiff to obtain the desired action from the directors: and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).

10

State substantive law applies to the question whether a complaint alleges facts with sufficient particularity to comply with Rule 23.1 and provides the level of deference given to a decision by the nominal defendant to terminate a derivative action. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991); *Burks v. Lasker* 441 U.S. 471 (1979). Because the Trust is a Massachusetts business trust, subsection 7.44 of the Massachusetts Business Corporation Act, MASS. GEN. LAWS ch. 156D, applies in this instance. *Halebian v. Berv*, 931 N.E.2d 986, 988 & n.4 (Mass. 2010) (applying the Massachusetts Business Corporations Act to a derivative suit brought on behalf of a business trust). That provision states:

> (a) A derivative proceeding commenced after rejection of a demand shall be dismissed by the court on motion by the corporation if the court finds that either: (1) 1 of the groups specified in subsection (b)(1) or (f) has determined in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation; or (2) shareholders specified in subsection (b)(3) have determined that the maintenance of the derivative proceeding is not in the best interests of the corporation.

Section 7.44(b)(1) provides that one of the groups that may make a determination described in § 7.44(a) is "a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum." There is no dispute between the parties that the group which made the determination for the Trust qualified under § 7.44(b)(1).

The Independent Trustee defendants and the Trust assert that the Trust's response to the demand letter demonstrates that the determination to refrain from taking action with respect to 12b-1 fees was made in good faith and after conducting a reasonable inquiry and that the plaintiff's Amended Complaint fails to state particularized facts alleging that the Trust failed to meet this standard.

Plaintiff does not allege particular facts demonstrating that the decision was not made in good faith or that it was not subject to a reasonable inquiry.  Instead, he argues that the decision to continue an allegedly illegal activity is not insulated by the "business judgment doctrine" codified in § 7.44. Accordingly, I must determine whether the alleged continuation of illegal payments is sufficient to overcome the standard set forth in § 7.44.

Section 7.44 codifies the common law "business judgment doctrine," often referred to as the "business judgment rule,"[5]

---

[5] In *Halebian v. Berv*, 931 N.E.2d 986 (Mass. 2010), the Supreme Judicial Court explained that the "business judgment doctrine" protects the determination of a board to terminate a derivative action, while the "business judgment rule shields individual directors from liability for damages stemming from decisions." *Id*. at 991 & n.11 (internal quotations omitted).  I will adopt that terminology, although the parties and cited cases sometimes use "business judgment rule" to refer to the "doctrine."  I note in this connection that the Independent Trustees and Trust defendants err in their suggestion that the two terms were consistently used in prior cases in the manner prescribed in *Halebian*.  *See, e.g., Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 101 (1991) ("The purpose of requiring a precomplaint

which was applied by Massachusetts courts prior to enactment of
the provision in 2004.  *See Harhen v. Brown*, 730 N.E.2d 859, 866
(Mass. 2000) ("To show that a demand has been wrongfully refused,
and that the directors are not entitled to the protection of the
business judgment rule, a plaintiff must allege facts that
challenge the board's good faith or the reasonableness of the
board's investigation of the plaintiff's demand.")  While a
Massachusetts court has not directly addressed the question
before this court, either before or after the enactment of the
statutory standard, the Supreme Judicial Court commented in
*Harhen* that, although the business judgment rule (doctrine)
generally applies, "[o]f course, where the failure to pursue a
claim in itself is an illegal act or results in the continuation
of an illegal act, the business judgement rule [doctrine] does
not apply."  *Id.* at n.7 (citing *Miller v. Am. Tel. & Tel. Co.*,
507 F.3d 759, 762 (3d Cir. 1974)).

---

demand is to protect the directors' prerogative to take over the
litigation or oppose it. . . . its decision to do the latter is
subject to only the deferential 'business judgment rule' standard
of review.") (internal citations omitted); *Miller v. Am. Tel. &
Tel. Co.,* 507 F.2d 759, 762 (3d Cir. 1974) ("The sound business
judgment rule, the basis of the district court's dismissal of
plaintiffs' complaint, expresses the unanimous decision of
American courts to eschew intervention in corporate decision
making if the judgment of directors and officers in [sp]
uninfluenced by personal considerations and is exercised in good
faith."); *Harhen v. Brown*, 730 N.E.2d 859, 865 (Mass. 2000) ("In
a demand refused case . . . a disinterested board that has
refused a plaintiff's pre-suit demand is entitled to the
protection of the business judgment rule.").

The parties cite to opposing authorities to answer the question whether an alleged violation of law constitutes sufficient particularity under the business judgment doctrine to survive dismissal.  *See, e.g.*, *In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 265 (1st Cir. 1973) (commenting that "[a] minority stockholder, unless his claim is worthless on its face, necessarily alleges some illegal transaction or conduct harmful to the corporation," in declining to find demand futile because directors had approved the actions at issue); *Landy v. D'Alessandro*, 316 F.Supp.2d 49, 65 (D. Mass. 2004) (applying Delaware's business judgment rule doctrine to conclude that "factual allegations that demonstrate that the transactions violate the law [are] insufficient, in the ordinary course, to create reasonable doubt that the board failed to exercise business judgment in approving the transaction").  *But see, e.g.*, *Miller*, 507 F.2d at 762 (concluding that "we are convinced that the business judgment rule cannot insulate the defendant directors from liability if they did in fact breach 18 U.S.C. § 610" and declining to dismiss the derivative action).

In the face of conflicting formulations regarding the actionability of claims regarding unlawful activity, I find plaintiff has stated a claim.  Given the alleged statutory violations - as opposed to allegations of conduct not alleged to be illegal but merely somehow otherwise harmful to the

14

corporation - I will apply the principle articulated in passing
in *Harhen*, and conclude that the facts pled by the plaintiff are
sufficient to fulfill the requirements of Rule 23.1 because the
complaint alleges that the "failure to pursue a claim . . .
results in the continuation of an illegal act."  *Harhen*, 730
N.E.2d at 866 n.7.  I can think of no public policy that would
encourage those with decision making authority to ignore
allegations of illegal conduct.  I turn now to the question
whether the conduct alleged is illegal.

**B.    *Failure to State a Claim Under Rule 12(b)(6)***

Plaintiff asserts five causes of action arising from the
alleged illegal activity variously seeking: (1) the voiding of
the Distribution Agreement between the Trust and Distributors
pursuant to section 47(b) of the Investment Company Act; (2) the
voiding of the Distribution Agreement between the Trust and
Distributors pursuant to Massachusetts common law because the
Agreement requires violations of duties owed to the Trust and
shareholders; (3) damages for breach of contract by Distributors
based on Distributors's warrant in the Distribution Agreement
that it will comply with federal securities laws; (4) damages for
breach of fiduciary duty by the Trustees; and (5) damages for
waste of trust assets by the Trustees.

Each cause of action asserted by Plaintiff depends upon the
conclusion that the 12b-1 fees paid by the Trust to Distributors,

and subsequently to individual broker-dealers, are made in violation of the Advisers Act.  I turn to the question whether that conclusion is supported by the allegations of the Amended Complaint.

### 1. Standard of Review

Confronted with a motion to dismiss based on its failure to "state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6), a court is required to determine whether the operative complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. V. Twombly*, 550 U.S. 544, 570 (2007)).  When considering a motion to dismiss, "the district court must take as true 'the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor.'"  *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002) (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992) (alteration in the original)).

### 2. "Special Compensation" under the Advisers Act

Plaintiff argues that asset-based Rule 12b-1 fees constitute "special compensation" for advisory services rendered to clients holding Class C shares of the Fund and therefore disqualify the broker-dealers from the broker-dealer exemption to the Advisers Act.  In order to understand fully the meaning of "special

compensation," it will be useful to examine the broader legislative history of the Advisers Act, judicial interpretation, and he SEC's recent rulemaking activity related to the term.

    *a.   Legislative History and Early Interpretation by the SEC*

"Special compensation" is not defined in the Advisers Act, and there is limited guidance as to its meaning in the legislative history.  At the time of enactment of the Advisers Act, "broker-dealers were paid fixed commission rates for the traditional package of services (including investment advice), and Congress understood 'special compensation' to mean non-commission compensation."  Certain Broker-Dealers Deemed Not to be Investment Advisers, Release Nos. 34-50,980 & IS-2340, 70 Fed. Reg. 2716, 2720 (Jan. 14, 2005) (Proposed Rule 2005); *see also* Certain Broker-Dealers Deemed Not to be Investment Advisers; Final Rule, Release Nos. 34-51,523 & IA-2376, 70 Fed. Reg. 20,424, 20,430 (Apr. 19, 2005).[6]

The Senate Banking and Currency Committee Report on the proposed Advisers Act stated that the definition of investment adviser exempts brokers "insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions."  S. Rep. No. 76-1775, at 22 (1940).

---

[6] The proposed rule and final rule described in these releases are discussed *infra* at Section II.B.2.c.  The final rule was ultimately vacated by the D.C. Circuit in *Fin. Planning Ass'n v. Sec & Exch. Comm'n*, 482 F.3d 481 (D.C. Cir. 2007).

Because "brokerage commissions" referred to one-time transitional fees; the Senate could have been led to understand that brokers received only transactional fees for their services and that the receipt of brokerage commissions for brokerage services would be exempt from the Advisors Act.

Although brokers were ordinarily paid transactional fees at the time the Advisers Act was enacted, it is questionable whether the term "special" is as a consequence accurately defined as "non-transactional."  "Special" could also mean "non-ordinary" compensation or compensation that a customer pays "specially for" - in this setting, advisory advice specifically provided by a broker-dealer.  Despite the definitional language in the Senate Report regarding the then—current understanding of broker-dealer compensation, I find no indication that Congress was more concerned with the form, as distinct from the purpose, of fees paid to broker-dealers.  *See* Proposed Rule 2005, 70 Fed. Reg. at 2720 ("There is no evidence that the 'special compensation' requirement was in included in section 202(a)(11)(C) for any purpose beyond providing an easy way of accomplishing the underlying goal of excepting only advice that was provided as part of the package of traditional brokerage services.").

Review of the history of the exemption shows that in implementing the Advisors Act over the years, the SEC has, in fact, focused on the *linkage* between compensation paid by

18

customers and any advisory services rendered by the broker-
dealer, rather than on the *form* of the compensation.  That is,
the SEC has historically looked to whether the broker-dealer was
specially compensated for the advice given (rather than
compensated for a package of brokerage or dealer services, in
which advice was "solely incidental").  The General Counsel of
the SEC issued an opinion a few years after enactment of Advisers
Act giving one of the earliest interpretations of the broker-
dealer exemption to the Advisors Act.  The opinion states that
the "portion of clause (C) which refers to 'special compensation'
amounts to a[] . . . clear recognition that a broker or a dealer
who is specially compensated for the rendition of advice should
be considered an investment adviser and not be excluded from the
purview of the Act merely because he is also engaged in effecting
market transactions in securities."  § 276.2 Opinion of the
General Counsel Relating to Section 202(a)(11)(C) of the
Investment Advisers Act of 1940, 11 Fed. Reg. 10,996 (Sept. 27,
1946).  The SEC's General Counsel was addressing various types of
compensation arrangements (all of which were transactional), and
his opinion demonstrates the SEC's understanding that the focus
of the term "special compensation" is on the connection between
the payment and the investment advice; the critical consideration
is "the distinction between compensation for advice itself and
compensation for services of another character to which advice is

merely incidental." *Id.* The approach of this opinion is found in the SEC's restatement of congressional intent in connection with recent rulemaking initiatives concerned with non-commission compensation, described further at Section II.B.2.c.

    *b.   Judicial Interpretation*

    Courts applying the broker-dealer exemption have also emphasized the importance of the connection between compensation and the investment advice rendered. Last month, the Tenth Circuit became the first appellate court to interpret the broker-dealer exemption in *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153 (10th Cir. 2011). After analyzing the legislative history of the statute and the various interpretative pronouncements of the SEC, the court concluded that:

> the IAA excludes a broker-dealer who provides advice
> that is attendant to, or given in connection with, the
> broker-dealer's conduct as a broker or dealer, so long
> as he does not receive compensation that is (1)
> received in exchange for the investment advice, as
> opposed to for the sale of the product, and (2)
> distinct from a commission or analogous transaction-
> based form of compensation for the sale of a product.

*Id.* In coming to this conclusion, the court analyzed the two prongs of the exemption: the "solely incidental" prong and the "special compensation" prong, explaining that a broker-dealer must satisfy both to qualify for the exemption. *Id.* at 1160-61. With respect to special compensation, the court found that compensation only qualifies as "special" when it is received in exchange for investment advice *and* it takes a form other than a

commission or similar transaction-based compensation.  *Id.* at
1165.  The court concluded that the term "special" would be
superfluous if it did not refer to some compensation other than
that normally received by broker-dealers.  *See id.* at 1164-65.
However, "special" compensation only disqualifies broker-dealers
from the exemption if it is also "received specifically in
exchange for giving advice, as opposed to some other service."
The opinion in *Thomas* thus reinforces the importance of the link
between investment advice and the compensation received
"therefor."  In applying the exemption, the Tenth Circuit held
that a Metropolitan Life Insurance Company ("Metropolitan")
employee whose compensation from Metropolitan was linked to the
*sale* of a variable life insurance policy "received compensation
for selling products, not for giving advice."  *Id.* at 1167.
Although the court went on to find that the employee also
received transactional fees which did not qualify as "special,"
*id.*, its decision emphasized that the lack of a specific
connection between the compensation and advisory services
demonstrates a basis for finding a broker-dealer in compliance
with the second prong of the exemption.

Other courts have also found the link between compensation
and advisory services critical to the application of the
exemption.  In *Kassover v. UBS AG*, 619 F.Supp.2d 28 (S.D.N.Y.
2008), the plaintiffs argued that co-defendant UBS FS received

"special compensation" for the sales of auction rate securities

("ARS") to UBS FS customers in the form of fees paid by third

parties for the provision of an ARS auction.  UBS FS received

"substantial annual compensation based on a percentage of the

total ARS issue" in addition to its brokerage commissions.  *Id.*

at 34 (internal quotations omitted).  Plaintiffs contended that

the percentage-based fees constituted "special compensation" and

disqualified UBS FS for the broker-dealer exemption.  The court

rejected plaintiff's categorical argument and stated that "the

'special compensation' must have been paid to UBS FS *for*

*providing investment advisory services to Plaintiffs.*"  *Id.*

(emphasis added); *see also Kaufman v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 464 F.Supp. 528, 538 (D. Md. 1978)

(declining to find "special compensation" where there was "no

indication" that the broker "received any fees specifically for

his advising" on investments).[7]

_____

[7]  Courts are in disagreement regarding whether it is
possible for a party not receiving the investment advice, and
which may have interests divergent from the investor's, to pay
"special compensation therefor" on behalf of someone else.  In
*Luzerne Cnty. Ret. Bd. v. Makowski*, 627 F.Supp.2d 506 (M.D. Penn.
2007), the alleged investment advisers "only received commissions
and fees from the vendors and/or providers of the investments
purchased by the" customer.  627 F.Supp.2d at 572.  Even though
the alleged advisers "were being retained to provide guidance and
advice with regard to investments" there was no evidence that
they received "compensation in exchange for the rendering of
investment advice," *id.* at 573; consequently the *Luzerne* court
concluded they were not investment advisers.  *Id.* at 573.  *But*
*see Kassover v. UBS AG*, 619 F.Supp.2d 28, 34 ("While Plaintiffs
correctly note that they need not have paid UBS FS the 'special

On occasion, a court has considered the form, and apparently the amount, of the payment in determining whether it constituted "special compensation."  In *Sec. & Exch. Comm'n v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 13 (D.D.C. 1998), the court cited the magnitude of a fees — 25% in transactional fees (10% finder's fee and 15% administrative fees) and 50% of any profits earned on the investment — as a factor in determining that the compensation arrangement was "not a commission received by a broker in the ordinary course of business."  *Id.* at 14.  While this compensation scheme was no doubt "special" in the sense of its appalling aggressiveness, it is not clear that any advisory services were more than incidental.  In any event, the cases demonstrate that the critical factor in determining whether a broker-dealer qualifies for the exemption is the connection of the payment to any advisory services rendered, and not the form of that payment. *Kenton Capital*'s consideration of the form and magnitude of the fee was only in comparison to payments ordinarily received by brokers and was not based on any reasoned analysis that asset-based fees always disqualify use of the exemption because they necessarily involve more than incidental advisory services.

---

compensation', the 'special compensation' must have been paid to UBS FS for providing investment advisory services to Plaintiffs.")

*c.   SEC's Rulemaking Efforts*

In an argument by negative implication, Plaintiff recounts the history of the SEC's recent unsuccessful attempt to promulgate a rule explicitly permitting broker-dealers to charge asset-based compensation with respect to brokerage accounts.  Am. Compl. ¶¶ 35-41.  The final rule adopted by the SEC in 2005 provided that a registered broker or dealer would "not be deemed to be an investment adviser based solely on its receipt of special compensation" so long as the broker or dealer, among other things,  does not charge "a separate fee, or separately contracts for, advisory services."  Broker-Dealers Final Rule 2005, 70 Fed. Reg. at 20,454.  The SEC implemented this rule under 15 U.S.C. § 80b-2(a)(11)(G) (formerly § 80b-2(a)(11)(F)), which authorizes the SEC to exempt "such other persons not within the intent of this paragraph" from the definition of investment adviser.  Even before implementing this rule, the SEC had favored asset-based compensation, as well as other alternative pricing systems, due to its belief that, as a policy matter, these systems "benefit broker-dealer customers by aligning their interests more closely with those of the brokerage firm and its registered representatives."  Certain Broker-Dealers Deemed Not to Be Investment Advisers, SEC Release Nos. 34-42099 & IA-1845, 64 Fed. Reg. 61,226, 61,227 (Nov. 10, 1999).  In this connection, the SEC took the position that these pricing schemes "essentially

re-price traditional full service brokerage programs but do not fundamentally change their nature." *Id*. Ultimately, the final rule promulgated by the SEC in 2005 was vacated by the D.C. Circuit in *Fin. Planning Ass'n. v. Sec. & Exch. Comm'n*, 482 F.3d 481 (D.C. Cir. 2007). The D.C. Circuit held that the SEC's rule impermissibly broadened the exemption provided in the Advisers Act. The court concluded that the SEC lacked the authority to expand exemption (c) because subsection (G) only authorizes the creation of exemptions for "other persons," and not those already covered by existing exemptions, such as broker-dealers. 482 F.3d at 487-93. From this outcome, Plaintiff argues that *Financial Planning* somehow found asset-based compensation to be *per se* "special compensation," and that broker-dealers receiving asset-based compensation must register as investment advisers. Am. Compl. ¶ 41.

I do not find that the SEC's 2005 rulemaking effort and the rejection of it in *Financial Planning* by a divided panel of the D.C. Circuit to be dispositive with respect to the interpretation of "special compensation." First, for its part, the D.C. Circuit did not have occasion to interpret and apply the meaning of "special compensation" in *Financial Planning*. It did not directly address the meaning or application of "special compensation" when deciding *Financial Planning* nor did it discuss how the definition would apply in a circumstance such as the one

25

at issue in this case.[8]  Second, for its part, the SEC was

apparently uncertain whether the broker-dealer exemption on its

face allowed for asset-based compensation (and thus whether the

rule was necessary).  The discussions in the 1999 and 2005 SEC

releases addressing the proposed and final rule are inconclusive

on this point.  *See* Proposed Rule 1999, 64 Fed. Reg. at 61,227

(stating that asset-based compensation "*may . . .* subject the

broker-dealers to regulation under the Act," and new brokerage

programs, including asset-based compensation "*raise questions* as

---

[8]  The *Financial Planning* majority briefly discussed the legislative history of the Advisers Act and the definition of "special compensation" and observed that "[t]he relevant language in the committee reports suggests that Congress deliberately drafted the exemption in subsection (C) to apply as written." 482 F.3d at 488.  After quoting the Senate Committee Report discussed *supra* at Section II.B.2.a, the court stated that "[b]y seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports."  *Id*.  Despite the reference to "brokerage commissions," presumably understood by the *Financial Planning* majority to mean transactional compensation, the court did not expand upon the meaning of "brokerage commission" or "special compensation" and, more importantly, did not find that asset-based compensation disqualifies a broker-dealer from the use of the exemption.

In his dissent, Judge Garland applied the analysis set out in *Chevron U.S.A, Inc. v. Natural Res. Def. Council Inc.*, 467 U.S. 837 (1984).  He found the term "such other persons" ambiguous as to whether it includes broker-dealers who receive non-transactional fees.  Having found this ambiguity, Judge Garland concluded that the SEC's exercise of its rulemaking authority to clarify the exemption available under the Advisers Act to be reasonable.  *Id.* at 493-501.

to whether they are receiving special compensation") (emphasis added); Final Rule 2005, 70 Fed. Reg. at 20,425 ("A broker-dealer receiving such fee-based compensation *may* be unable to rely on the statutory broker-dealer exception . . . .") (emphasis added). The rule the Commission ultimately promulgated was intended to resolve any lingering uncertainties by providing a safe harbor for asset based compensation, but it did so as a prophylactic, it did not do so on the basis that asset-based compensation was necessarily "special compensation."

> d.   *"Special Compensation" and the 12b-1 Fees Paid by the Trust to Distributors*

Given the purposes of the Advisers Act and the broker-dealer exemption, and the prior case law directly applying the exemption, I decline to find that the asset-based 12b-1 fees paid by the Trust automatically disqualify broker-dealers from the use of the exemption.  As described above, courts rely on fact-based inquiries into the compensation paid, the services rendered, and evaluation of the connection between the two in determining whether the exemption applies.  Plaintiff fails to allege sufficient facts to claim that the broker-dealer exemption does not apply here.  In particular, there is no allegation that any advisory services have been rendered with respect to the brokerage accounts or that the 12b-1 fees here are actually "special compensation" *for* the broker-dealers' advisory services to their customers.  Although the Amended Complaint cites

27

statements from some industry representatives that 12b-1 fees are generally used to compensate intermediaries for "advice and other services," it makes no such allegations about the services rendered with respect to the Class C shares in the Fund. *Id.* at ¶¶ 53-55.  In fact, Rule 12b-1 fees are, by definition, paid by investment companies to effect the distribution of their shares. 17 C.F.R. § 270.12b-1; *see Smith v. Franklin/Templeton Distribs.*, No. 09-4775, 2010 WL 2348644, at *8 (N.D. Cal. June 8, 2010) ("*Franklin/Templeton* I") (observing that 12b-1 fees are "fees paid by a fund (here, the Trust) in connection with the distribution of the fees").  The most that can be said is that 12b-1 fees, even asset-based 12b-1 fees, compensate broker-dealers for a bundle of services including advice.  But the advisory services are not unbundled in any fashion that could be characterized as "special" as opposed to incidental.

Consistent with Rule 12b-1, the fees paid by the Trust are described in the Distribution Plan as "distribution charges and service fees," Am. Compl. ¶ 44., and Distributors also makes payments for "marketing support" and "administrative services." *Id.* (internal quotations omitted).  There are no facts alleged that would demonstrate that the 12b-1 fees at issue here constitute special compensation for advisory services.

I must further observe that, even if the Trust's payments somehow required broker-dealers to treat accounts holding Class C

shares as advisory accounts, the Advisory Act only places a legal burden *on the broker-dealers* to register properly and comply with other regulatory provisions.  The Trust has no legal obligation to ensure that these actions are taken.  As a result, continuing payments would not constitute a direct violation of the Advisory Act by the Trust.  *See Franklin/Templeton I* at *8 (stating that, if the receipt of the fees required registration by broker-dealers, "that would not have meant that the payment of such fees violated the [Advisors Act]").  Plaintiff has argued that litigation such as this will encourage policing of broker-dealer responsibilities by entities such as Defendant.  Whether that makes good public policy and should be adopted by the SEC in some rulemaking, it does not support a derivative action on grounds of illegal conduct by the Trust.

   3.   Application to the Claims of the Complaint

   a.   *First Cause of Action: Contract Voiding Under the Investment Company Act*

   Plaintiff invokes §§ 36(a) and 47(b) of the Investment Company Act, 15 U.S.C. §§ 80a-35(a), 80a-46(b), and SEC Rule 38a-1, 17 C.F.R. § 270.38a-1, promulgated under the Act, to contend that the compensation arrangement in the Distribution Agreement is voidable under Federal law.  Even if the payment of asset-based 12b-1 fees constituted a violation of the Advisers Act - which I have concluded it does not - any such violation would not give rise to a cause of action under the Investment Company Act.

29

Section 47(b) of the Investment Act Company provides that "[a] contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party" except as to "the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract."  15 U.S.C. § 80a-46(b).  The "subchapter" referred to is the Investment Company Act itself, 15 U.S.C. § 80a-1 *et seq*.  Plaintiff contends that the alleged violations of the Advisers Act constitute violations of § 36(a) of the Investment Company Act and SEC Rule 38a-1, thereby forming a grounds for voiding the contract under § 47(b).  But § 36(a) of the Investment Company Act by its terms only authorizes the SEC, not private parties, to bring actions against certain individuals, including mutual fund directors and trustees, for past or current acts or practices constituting a "breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts."  15 U.S.C. § 80a-35(a).  Plaintiff, however, argues that § 36(a) creates an implied federal fiduciary duty of the Trustees and Distributors to the Trust which is breached by the use of Trust assets to pay illegal compensation to broker-dealers, Am. Compl. ¶¶ 60-61, and which may ground an implied right of action for bringing a § 47(b) action.

30

Plaintiff further argues that the payments violate SEC Rule 38a-1.  Among other things, SEC Rule 38a-1 requires investment companies to adopt compliance policies and procedures and designate a chief compliance officer ("CCO") responsible for administering the policies and procedures and for providing a report to the board, at least annually, of "[e]ach Material Compliance Matter" occurring since the last report.  17 C.F.R. § 270.38a-1.  A "Material Compliance Matter" is defined to include "[a] violation of the Federal securities laws by the funds, its investment adviser, principal underwriter, administrator or transfer agent (or officers, directors, employees or agents there- of)."  17 C.F.R. § 270.38a-1(e)(2).  "Federal securities laws" include both the Investment Company Act and the Advisers Act.  17 C.F.R. § 270.38a-1(e)(1).  Plaintiff concludes that this regulatory scheme "reinforces" the § 36(a) fiduciary duty.

Plaintiff argues that the performance of the Distribution Agreement, and specifically the payment of asset-based 12b-1 fees to broker-dealers in alleged violation of the Advisers Act, violates the following duties arising out of Investment Company Act § 36(a) and Rule 38a-1: (a) the duty of the Trust, Trustees and Distributors to not make unlawful compensation payments to broker-dealers; (b) the duty of the Independent Trustees to monitor Distributors and its agents for compliance with Federal securities laws; and (c) the duty of the Trustees and Distributors

to act as fiduciaries for the fund's shareholders.  Am. Compl. ¶ 78.  These violations of duties are also said to ground a private right of action under § 47(b).

### I. Section 36(a)

Plaintiff asserts that § 36(a), together with § 47(b), creates an implied right of action to rescind a contract for the Trustees' violations of their fiduciary duty to not violate the Advisers Act.  Under *Alexander v. Sandoval,* 532 U.S. 275 (2001), an implied right of action must be found in the "text and structure" of a statute.  532 U.S. at 288.  Section 36(a) is not a substantive provision; it authorizes the SEC to bring actions against individuals who breach their fiduciary duties and does not itself create a private right of action.  *See Stegall v. Ladner*, 394 F.Supp.2d 358, 367-72 (D. Mass. 2005) (holding that § 36(a) does not create a private right of action); *see also Hamilton v. Allen*, 396 F.Supp.2d 545, 555 (E.D. Pa. 2005); *Mutchka v. Harris*, 373 F.Supp.2d 1021, 1027 (C.D. Cal. 2005) (holding that no private right of action is created by § 36(a)).

Section 47(b) creates a private right of action for a party to a contract to void or rescind a contract, *Mathers Fund, Inc. v. Colwell Co.,* 564 F.2d 780, 783 (7th Cir. 1977), but explicitly limits the right to "[a] contract that is made, or whose performance involves, a violation of [the Investment Company Act], or of any rule, regulation, or order thereunder."  15 U.S.C. §

80a-47(b)(1).  I decline to extend the right of action under §

47(b) to an alleged breach of an implied federal fiduciary duty

under § 36(a) resulting from the violation of a separate law by a

non-defendant entity.  There is no evidence that Congress intended

the right created in § 47(b) to encompass laws other than the

Investment Company Act through the operation of § 36(a), and a

court "cannot ordinarily conclude that Congress intended to create

a right of action when none was explicitly provided."  *Olmsted v.*

*Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 432 (2d Cir.

2002).  The plain terms of § 47(b) create a strong presumption

that Congress intended to limit the right of action for rescission

to violations of substantive legal obligations found in the

Investment Company Act.  *See Franklin/Templeton I* at *7 ("This

court finds no language in Investment Company Act § 47(b)

sufficient to create a private right of action under that statute,

absent a showing of some other violation of the Investment Company

Act.").[9]  I conclude that the text and structure of the Investment

Company Act preclude a private right of action in this case under

§§ 47(b) and 36(a).

---

[9] *Franklin/Templeton* involved federal claims similar to those at issue in the instant case.  The Court permitted the plaintiff to amend his complaint in the face of dismissal, and ultimately dismissed the amended complaint on the basis of a failure to show a violation of either § 36(a) or SEC Rule 38a-1. *Smith v. Franklin/Templeton Distribs.*, No. 09-4775, 2010 WL 4286326 (N.D. Cal. Oct. 22, 2010) ("*Franklin/Templeton II*") appeal docketed No. 10-17648 (9th Cir. Nov. 22, 2010).

33

*ii.   Rule 38a-1*

Plaintiff also argues that the Distribution Agreement should be voided because it violates duties arising out of SEC Rule 38a-1.  Am. Compl. ¶ 73.  As described above, Rule 38a-1 outlines mandatory compliance procedures and practices for registered investment companies, including the adoption of policies and procedures, designation of a CCO who must provide a written report annually to the board, and the maintenance of certain records.  17 C.F.R. § 270.38a-1.  The Amended Complaint does not allege that defendants violated any of the requirements set out in Rule 38a-1, but rather argues that this rule implies certain general duties which are violated by the Trust's illegal payments to broker-dealers who should also be registered advisors.  There is no evidence that the SEC intended Rule 38a-1 to create such duties, nor does Plaintiff appear to allege that the performance of the Distribution Agreement *requires* the allegedly illegal activity; so long as the Distribution Agreement does not prohibit broker-dealers from registering the accounts as advisory accounts, performance can be accomplished without implicating the Advisers Act.  I find no violation alleged as to the Defendants of any duties under Rule 38a-1 and consequently conclude there is no basis for the First Cause of Action under section 47(b).

_____*b.   Second Cause of Action: Contract Voiding Pursuant to State Law Against Defendant Distributors*

Plaintiff's second cause of action is for the voiding of the broker-dealer compensation provisions in the Distribution Agreement pursuant to state law because performance cannot be accomplished without violating duties under the Investment Company Act, SEC Rule 38a-1, and the Advisers Act.  Am. Compl. ¶ 78. Plaintiff also asks for restitution of past payments to Distributors and the broker-dealers because the payments constitute unjust enrichment.  *Id*. ¶ 80.  Having concluded that the complaint has not alleged that any duties have been violated under the Investment Company Act, SEC Rule 38a-1, or the Advisers Act, I conclude plaintiff has therefore failed to state a claim upon which relief can be granted under the Second Cause of Action.

____*c.   Third Cause of Action: Breach of Contract by Distributors*

Plaintiff's third cause of action is for breach of contract by Distributors.  In the Distribution Agreement, Distributors warrants that it and its sub-agent broker-dealers will comply with federal securities laws.  Am. Compl. ¶ 82.  Plaintiff asserts that the payments of asset-based compensation constitute material breaches of this warranty.  Plaintiff claims damages in the form of the amount paid of asset-based compensation to Distributors and the individual-broker dealers.  Am. Compl. ¶ 83.  Having determined that the payment of asset-based compensation does not

35

categorically violate federal securities laws, I conclude the complaint does not state a claim for its Third Cause of Action.

_____d.   *Fourth and Fifth Causes of Action*

Plaintiff's fourth and fifth causes of action, brought against the Trustee defendants, are for breach of the Trustees' fiduciary duties and for waste of Trust assets.  The fourth and fifth causes of action are "asserted based upon the Trustee Defendants' acts in violation of state law, which acts constitute a breach of fiduciary duty" and the "authorizing [of] payment of unlawful asset-based compensation from trust assets."  Am. Compl. ¶ 88.  Presumably, "state law" refers to some incorporation of the alleged violations of the Advisers Act and/or the Investment Company Act.  Having found no violations of law to be incorporated, I conclude Plaintiff fails to state a claim upon which relief may be granted on the Fourth and Fifth causes of action.

### III. CONCLUSION

For the reasons set out above, I GRANT Defendants' motions to dismiss as to all causes of action.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE